## IN RE KEMMLER, Petitioner.

### ORIGINAL.

No. 13. Original. Argued May 20, 1890. — Decided May 23, 1890.

*Ex parte Mirzan*, 119 U. S. 584, affirmed and applied.

A writ of error to the highest court of a State is not allowed as of right, and ought not to be sent out when this court, after hearing, is of opinion that it is apparent upon the face of the record that the issue of the writ could only result in the affirmance of the judgment.

Chapter 489 of the Laws of New York of 1888, which provides that " the punishment of death must in every case be inflicted by causing to pass through the body of a convict a current of electricity of sufficient intensity to cause death, and the application of such current must be continued until such convict is dead," is not repugnant to the Constitution of the United States, when applied to a convict who committed the crime for which he was convicted after the act took effect.

On the 5th May, 1890, *Mr. Roger M. Sherman* filed a petition for an original writ of *habeas corpus* on behalf of Kemmler, accompanied by a statement in which he said:

" This is a motion for an original writ of *habeas corpus*.

" The petitioner is under sentence of death in the Northern District of New York, under a statute of New York, which imposes the punishment of death by the passing through his body of a current of electricity sufficient, in the opinion of the warden of the State Prison, to cause his death, which current is to be continued until it kills him; the statute also leaves it to the warden to fix the day and hour of his death, and contains other features which he here asserts are in violation of the Fourteenth Amendment. These features abridge his privileges and immunities as a citizen of the United States and deprive him of his life without due process of law.

" Judge Wallace has granted a writ, in the emergency, to afford an opportunity to make this application. The case having been passed upon under the state constitution by the Court of Appeals, it is suggested that an original writ here is proper.

" The petition, an affidavit showing the emergency, the opinion of the Court of Appeals of New York, and the state statute are herewith submitted."

The court at once gave him a hearing, and when he had concluded it announced its judgment.

PER CURIAM. This case is governed by the rule laid down in *Ex parte Mirzan*, 119 U. S. 584; and inasmuch as the writ of *habeas corpus* has been granted by the Judge of the United States Circuit Court, and the case is proceeding to a hearing there, we must

*Deny the application.*

It was then suggested by Mr. JUSTICE BLATCHFORD, to whom an application had been made for a writ of error to the Court of Appeals of the State of New York to bring up Kemmler's case, that the application should be made to the full court, to be heard on the 19th of May, and notice thereof be given to the Attorney General of New York, and a corresponding order was made.

The 19th of May passed without hearing this motion. On the 20th it came up and and was heard.

*Mr. Roger M. Sherman* for the petitioner.

*Mr. Charles F. Tabor*, Attorney General of the State of New York, opposing.

· MR. CHIEF JUSTICE FULLER delivered the opinion of the court :

This is an application for a writ of error to bring up for review a judgment of the Supreme Court of the State of New York, affirming an order of the county judge of Cayuga County, remanding the relator to the custody of the warden of the State Prison at Auburn, upon a hearing upon *habeas corpus*. The judgment of the Supreme Court was entered upon a judgment of the Court of Appeals of the State of New York, affirming a previous order of the Supreme Court. The application was originally presented to Mr. Justice Blatchford, and, upon his suggestion, was permitted to be made in open court, and has been heard upon full argument.

A writ of error to the highest court of a State is not allowed as of right, and ought not to be sent out when the court in session, after hearing, is of opinion that it is apparent upon the face of the record that the issue of the writ could only result in the affirmance of the judgment. *Spies* v. *Illinois*, 123 U. S. 131.

The writ of *habeas corpus* was allowed on the 11th day of June, 1889, and made returnable before the county judge of Cayuga County. The petition was filed by one Hatch, and stated "that William Kemmler, otherwise called John Hort, is imprisoned or restrained in his liberty, at Auburn State Prison, in the city of Auburn, county of Cayuga, State of New York, by Charles F. Durston, agent and warden of Auburn State Prison, having charge thereof. That he has not been committed and is not detained by virtue of any judgment,

decree, final order or process issued by a court or judge of the United States, in a case where such courts or judges have exclusive jurisdiction under the laws of the United States, or have acquired exclusive jurisdiction by the commencement of legal proceedings in such a court; nor is he committed or detained by virtue of the final judgment or decree of a competent tribunal of civil or criminal jurisdiction, or the final order of such a tribunal made in the special proceedings instituted for any cause except to punish him for contempt; or by virtue of an execution or other process issued upon such a judgment, decree or final order. That the cause or pretence of the imprisonment or restraint of said William Kemmler, otherwise called John Hort, according to the best knowledge and belief of your petitioner, is that he was indicted by a grand jury of Erie County, for murder in the first degree; that he was tried therefor at a Court of Oyer and Terminer of Erie County, and found guilty thereof by the verdict of a jury on the 10th day of May, 1889; that thereafter and on the 14th day of May, 1889, he was arraigned in said Court of Oyer and Terminer for sentence; that, contrary to the constitution of the State of New York and of the United States, and contrary to his objection and exception, duly and timely taken in due form of law, he was sentenced to undergo a cruel and unusual punishment, as appears by a copy of the pretended judgment, warrant or mandate hereto annexed, and made a part of this petition and marked Exhibit 'A' by virtue of which such imprisonment or restraint is claimed to be made; that he is deprived of liberty and threatened with deprivation of life without due process of law, contrary to the constitutions of the State of New York and of the United States, and contrary to his objection and exception thereto, duly and timely taken. The imprisonment is stated to be illegal because it is contrary to the provisions of each of said constitutions."

The warden of the Auburn State Prison made the following return:

"*First.* That I am the duly appointed and acting Warden and Agent of the Auburn State Prison, and on the said 11th day of June, 1889, and before the said writ of *habeas corpus*

was served upon and came to me, the said William Kemmler, otherwise called John Hort, was and now is in my custody and detained by me in the State Prison at Auburn, in the State of New York, under and by virtue of a judgment of the Court of Oyer and Terminer of the State of New York, held in and for the county of Erie, on the 14th day of May, 1889, duly convicting the said William Kemmler, otherwise called John Hort, of murder in the first degree. A true copy of the judgment roll of the aforesaid conviction is hereto attached as a part hereof, and marked Exhibit 'A.'

"And said William Kemmler, otherwise called John Hort, is also detained in my custody as such Warden and Agent under and by virtue of a warrant signed by the Hon. Henry A. Childs, the Justice of the Supreme Court before whom the said William Kemmler, otherwise called John Hort, was, as aforesaid, duly tried and convicted, and which said warrant was duly issued in pursuance of the aforesaid conviction, and in compliance with the provisions of the Code of Criminal Procedure, relating thereto, a copy of which said warrant is hereto annexed as a part hereof, and marked Exhibit 'B.'

"*Second.* And I, the said Charles F. Durston, Agent and Warden of Auburn State Prison, do make a further return and allege as I am advised and verily believe to be true, that the said William Kemmler, otherwise called John Hort, was not sentenced as hereinbefore set forth, to undergo a cruel and unusual punishment, contrary to the provisions of the constitution of the State of New York and the Constitution of the United States.

"And I do further allege that the said imprisonment and restraint of the said William Kemmler, otherwise called John Hort, and the deprivation of his liberty and the threatened deprivation of life, are not without due process of law and are not contrary to the provisions of the constitution of the State of New York or the Constitution of the United States, as alleged in the petition upon which said writ of *habeas corpus* was granted.

"I do further allege, as I am advised, that the said judgment of conviction hereinbefore set forth, and the aforesaid

warrant and the punishment and deprivation of liberty and the threatened deprivation of life of the said William Kemmler, otherwise called John Hort, thereunder, are fully warranted by the provisions of chapter 489 of the Laws of 1888, which is a valid enactment of the legislature of the State of New York, and it is not in conflict with or in violation of the provisions of the constitution of the State of New York or the Constitution of the United States.

"And I hold the said William Kemmler, otherwise called John Hort, under and by virtue of no other authority than as hereinbefore set forth."

Copies of the indictment of Kemmler, otherwise called Hort, for the murder of Matilda Zeigler, otherwise called Matilda Hort; the judgment and sentence of the court; and the warrant to the warden to execute the sentence, were attached to the petition and return. The conclusion of the warrant, pursuing the sentence, was in these words: " Now, therefore, you are hereby ordered, commanded and required to execute the said sentence upon him, the said William Kemmler, otherwise called John Hort, upon some day within the week commencing on Monday, the 24th day of June, in the year of our Lord one thousand eight hundred and eighty-nine, and within the walls of Auburn State Prison, or within the yard or enclosure adjoining thereto, by then and there causing to pass through the body of him, the said William Kemmler, otherwise called John Hort, a current of electricity of sufficient intensity to cause death, and that the application of such current of electricity be continued until he, the said William Kemmler, otherwise called John Hort, be dead."

Upon the return of the writ before the county judge, counsel for the petitioner offered to prove that the infliction of death by the application of electricity as directed "is a cruel and unusual punishment, within the meaning of the Constitution, and that it cannot, therefore, be lawfully inflicted, and to establish the facts upon which the court can pass, as to the character of the penalty. The Attorney General objected to the taking of testimony as to the constitutionality of this law, on the ground that the court has no authority to take such

proof. The objection was thereupon overruled, and the Attorney General excepted." A voluminous mass of evidence was then taken as to the effect of electricity as an agent of death. And upon that evidence it was argued that the punishment in that form was cruel and unusual within the inhibition of the constitutions of the United States and of the State of New York, and that therefore the act in question was unconstitutional.

The county judge observed that the "Constitution of the United States and that of the State of New York, in language almost identical, provide against cruel and inhuman punishment, but it may be remarked, in passing, that with the former we have no present concern, as the prohibition therein contained has no reference to punishments inflicted in state courts for crimes against the State, but is addressed solely to the national government and operates as a restriction on its power." He held that the presumption of constitutionality had not been overcome by the prisoner, because he had not "made it appear by proofs or otherwise, beyond doubt, that the statute of 1888 in regard to the infliction of the death penalty provides a cruel and unusual, and therefore unconstitutional, punishment, and that a force of electricity to kill any human subject with celerity and certainty, when scientifically applied, cannot be generated." He, therefore, made an order dismissing the writ of *habeas corpus*, and remanding the relator to the custody of the respondent. From this order an appeal was taken to the Supreme Court, which affirmed the judgment of the county judge. The Supreme Court was of opinion, *People &c.* v. *Durston, Warden, &c.*, 55 Hun, 64, that it was not competent to support the contention of the relator by proofs *aliunde* the statute; that there was nothing in the constitution of the government or in the nature of things giving any color to the proposition that, upon a mere question of fact involved in legislation, the judgment of a court is superior to that of the legislature itself, nor was there any authority for the proposition that in respect to such questions, relating either to the manner or the matter of legislation, the decision of the legislature could be reviewed by the

court; and that the presumption that the legislature had ascertained the facts necessary to determine that death by the mode prescribed was not a cruel punishment, was conclusive upon the court. And Dwight, J., delivering the opinion, also said: "We have read with much interest the evidence returned to the county judge, and we agree with him that the burden of the proof is not successfully borne by the relator. On the contrary, we think that the evidence is clearly in favor of the conclusion that it is within easy reach of electrical science at this day to so generate and apply to the person of the convict a current of electricity of such known and sufficient force as certainly to produce instantaneous, and, therefore, painless, death."

From this judgment of the Supreme Court an appeal was prosecuted to the Court of Appeals, and the order appealed from was affirmed. It was said for the court by O'Brien, J.: "The only question involved in this appeal is whether this enactment is in conflict with the provision of the state constitution which forbids the infliction of cruel and unusual punishment. . . . If it cannot be made to appear that a law is in conflict with the constitution, by argument deduced from the language of the law itself or from matters of which a court can take judicial notice, then the act must stand. The testimony of expert or other witnesses is not admissible to show that in carrying out a law enacted by the legislature some provision of the constitution may possibly be violated." The determination of the legislature that the use of electricity as an agency for producing death constituted a more humane method of executing the judgment of the court in capital cases, was held conclusive. The opinion concludes as follows: "We have examined this testimony and can find but little in it to warrant the belief that this new mode of execution is cruel, within the meaning of the constitution, though it is certainly unusual. On the contrary, we agree with the court below that it removes every reasonable doubt that the application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in

painless, death." At the same term of the Court of Appeals the appeal of the relator from the judgment on the indictment against him was heard, and that judgment affirmed. Among other points made upon that appeal was this, that the sentence imposed was illegal and unconstitutional, as being a cruel and unusual punishment, but the court decided, as in the case of the appeal from the order under consideration here, that the position was untenable, and that the act was not unconstitutional because of the new mode adopted to bring about death.

We find, then, the law held constitutional by the court of Oyer and Terminer in rendering the original judgment; by the Supreme Court and the Court of Appeals in affirming it; by the county judge in the proceedings upon the writ of *habeas corpus;* by the Supreme Court in affirming the order of the county judge; and by the Court of Appeals in affirming that judgment of the Supreme Court.

It appears that the first step which led to the enactment of the law was a statement contained in the annual message of the governor of the State of New York, transmitted to the legislature January 6, 1885, as follows: "The present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner. I commend this suggestion to the consideration of the legislature." The legislature accordingly appointed a commission to investigate and report "the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases." This commission reported in favor of execution by electricity, and accompanied their report by a bill which was enacted and became chapter 489 of the Laws of 1888. Laws of New York, 1888, 778. Among other changes, section 505 of the Code of Criminal Procedure of New York was amended so as to read as follows: "§ 505. The punishment of death must, in every case, be inflicted by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death, and the application of such current must be continued

until such convict is dead." Various other amendments were made, not necessary to be considered here.

Sections 10, 11 and 12 of the act are as follows:

"§ 10. Nothing contained in any provision of this act applies to a crime committed at any time before the day when this act takes effect. Such crime must be punished according to the provisions of law existing when it is committed, in the same manner as if this act had not been passed; and the provisions of law for the infliction of the penalty of death upon convicted criminals, in existence on the day prior to the passage of this act, are continued in existence and applicable to all crimes punishable by death, which have been or may be committed before the time when this act takes effect. A crime punishable by death committed after the beginning of the day when this act takes effect, must be punished according to the provisions of this act, and not otherwise.

"§ 11. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed.

"§ 12. This act shall take effect on the first day of January, one thousand eight hundred and eighty-nine, and shall apply to all convictions for crimes punishable by death, committed on or after that date."

Kemmler was indicted for and convicted of a murder committed on the 29th day of March, 1889, and therefore came within the statute. The inhibition of the Federal Constitution upon the passage of *ex post facto* laws has no application.

Section 5 of article 1, of the constitution of the State of New York, provides that "excessive bail shall not be required, nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained." The Eighth Amendment to the Federal Constitution reads thus: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." By the Fourteenth Amendment it is provided that: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immuni-

ties of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It is not contended, as it could not be, that the Eighth Amendment was intended to apply to the States, but it is urged that the provision of the Fourteenth Amendment, which forbids a State to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, is a prohibition on the State from the imposition of cruel and unusual punishments, and that such punishments are also prohibited by inclusion in the term "due process of law."

The provision in reference to cruel and unusual punishments was taken from the well-known act of Parliament of 1688, entitled "An act declaring the rights and liberties of the subject, and settling the succession of the crown," in which, after rehearsing various grounds of grievance, and among others, that "excessive bail hath been required of persons committed in criminal cases, to elude the benefit of the laws made for the liberty of the subjects; and excessive fines have been imposed; and illegal and cruel punishments inflicted," it is declared that "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." [1] Stat. 1 W. & M. c. 2. This Declaration of Rights had reference to the acts of the executive and judicial departments of the government of England; but the language in question as used in the constitution of the State of New York was intended particularly to operate upon the legislature of the State, to whose control the punishment of crime was almost wholly confided. So that, if the punishment prescribed for an offence against the laws of the State were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition. And we think

---

[1] *Note by the Court.* In the "Body of the Liberties of the Massachusetts Colony in New England," of 1641, this language is used: "For bodilie punishments we allow amongst us none that are inhumane, Barbarous or cruel." Colonial Laws of Massachusetts (1889), p. 43.

this equally true of the Eighth Amendment, in its application to Congress.

In *Wilkerson* v. *Utah*, 99 U. S. 130, 135, Mr. Justice Clifford, in delivering the opinion of the court, referring to Blackstone, said: "Difficulty would attend the effort to define with exactness the extent of the constitutional provision, which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life.

The courts of New York held that the mode adopted in this instance might be said to be unusual because it was new, but that it could not be assumed to be cruel in the light of that common knowledge which has stamped certain punishments as such; that it was for the legislature to say in what manner sentence of death should be executed; that this act was passed in the effort to devise a more humane method of reaching the result; that the courts were bound to presume that the legislature was possessed of the facts upon which it took action; and that by evidence taken *aliunde* the statute that presumption could not be overthrown. They went further, and expressed the opinion that upon the evidence the legislature had attained by the act the object had in view in its passage.

The decision of the state courts sustaining the validity of the act under the state constitution is not reëxaminable here, nor was that decision against any title, right, privilege, or immunity specially set up or claimed by the petitioner under the Constitution of the United States.

Treating it as involving an adjudication that the statute was not repugnant to the Federal Constitution, that conclusion was so plainly right that we should not be justified in allow-

ing the writ upon the ground that error might have supervened therein.

The Fourteenth Amendment did not radically change the whole theory of the relations of the state and Federal governments to each other, and of both governments to the people. The same person may be at the same time a citizen of the United States and a citizen of a State. Protection to life, liberty and property rests primarily, with the States, and the amendment furnishes an additional guaranty against any encroachment by the States upon those fundamental rights which belong to citizenship, and which the state governments were created to secure. The privileges and immunities of citizens of the United States, as distinguished from the privileges and immunities of citizens of the States, are indeed protected by it; but those are privileges and immunities arising out of the nature and essential character of the national government, and granted or secured by the Constitution of the United States. *United States* v. *Cruikshank,* 92 U. S. 542; *Slaughterhouse Cases,* 16 Wall. 36.

In *Hurtado* v. *California,* 110 U. S. 516, 534, it is pointed out by Mr. Justice Matthews, speaking for the court, that the words " due process of law," as used in the Fifth Amendment, cannot be regarded as superfluous, and held to include the matters specifically enumerated in that article, and that when the same phrase was employed in the Fourteenth Amendment it was used in the same sense and with no greater extent.

As due process of law in the Fifth Amendment referred to that law of the land which derives its authority from the legislative powers conferred on Congress by the Constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law, so, in the Fourteenth Amendment, the same words refer to that law of the land in each State, which derives its authority from the inherent and reserved powers of the State, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. Undoubtedly the amendment forbids any arbitrary deprivation of life, liberty, or

property, and secures equal protection to all under like circumstances in the enjoyment of their rights; and, in the administration of criminal justice, requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offences. But it was not designed to interfere with the power of the State to protect the lives, liberties and property of its citizens, and to promote their health, peace, morals, education and good order. *Barbier* v. *Connolly*, 113 U. S. 27, 31.

The enactment of this statute was in itself within the legitimate sphere of the legislative power of the State, and in the observance of those general rules prescribed by our systems of jurisprudence; and the legislature of the State of New York determined that it did not inflict cruel and unusual punishment, and its courts have sustained that determination. We cannot perceive that the State has thereby abridged the privileges or immunities of the petitioner, or deprived him of due process of law.

In order to reverse the judgment of the highest court of the State of New York, we should be compelled to hold that it had committed an error so gross as to amount in law to a denial by the State of due process of law to one accused of crime, or of some right secured to him by the Constitution of the United States. We have no hesitation in saying that this we cannot do upon the record before us.

The application for a writ of error is　　　*Denied.*