## Gibson v. Commonwealth.

(Decided October 10, 1924.)

### Appeal from Fayette Circuit Court.

1. Statutes—Title of Amendatory Act Describing Statute by Reference Held Not Invalid.—Acts 1922, c. 97, entitled, "An act to amend section 1159, Ky. Statutes, Carroll's 1915 edition, relating to burglary and robbery," held not unconstitutional as having defective title, in view of Act February 29, 1904, c. 4.

2. Statutes—Parts of Amended Statute Not Set Out Held Repealed.— Acts 1922, c. 97, amending Ky. Stats., section 1159, to provide that "every person guilty of burglary shall be punished with death, or confinement in the penitentiary for life, in the discretion of the jury," repeals remainder of section 1159 not set out in amendatory act; Constitution 51 being mandatory.

3. Criminal Law—Article 8 of Federal Constitution only Applies to United States Government.—Prohibition of Constitution U. S. Amend. 8, relative to cruel and unusual punishment, applies only to United States government and courts of that government.

4. Criminal Law—Burglary Statute Held Not Invalid as Imposing Cruel Punishment.—Ky. Stats., section 1159, as amended by Acts

1922, c. 97, making every person guilty of burglary punishable by death, or confinement for life, does not inflict cruel punishment, so as to violate Constitution, section 17.

5. Criminal Law—Discretion of Legislature in Determining Adequacy of Punishment Almost Unlimited.—Notwithstanding Constitution, section 17, discretion of Legislature in determining adequacy of punishment for crime is almost, if not quite, unlimited.

6. Criminal Law—It is Duty of Court to Give Whole Law of Case.—It is duty of court to give whole law of case as warranted by facts proven, though not asked for or offered.

7. Criminal Law—If Jury Not Properly Instructed, Case Must be Reversed.—If instructions given do not accurately state law, or court fails to give instruction on point of law upon which defendant is entitled to have jury instructed, conviction must be reversed.

8. Criminal Law—Accused Held Not Entitled to Instruction Telling Jury that, if he Entered House Through Open Door, they should Acquit Him of Burglary.—In burglary prosecution, accused was not entitled to instruction telling jury that, if he entered house through open door, they should acquit him, where defendant denied entry was forcible, and that he intended to commit felony.

9. Criminal Law—How and when Accused's Theory of Case should be Presented by Instruction.—Ordinarily defendant's theory of case is simply "not guilty," and is fully presented by instruction to acquit him, unless he is proved guilty beyond all reasonable doubt, but where he admits one or more of essential elements of offense charged, but attempts to avoid conviction by proving facts or circumstances to excuse what he did, his theory of case should be set out in special instruction.

10. Burglary—Elements of Burglary Stated.—Burglary consists of forcible, nocturnal entrance into dwelling for commission of felony.

11. Burglary—Defendant, Denying Both Forcible Entry and Intent to Commit Felony, Not Entitled to Instruction as to Nature and Purpose of Entry.—Where defendant in burglary prosecution claimed he entered through open door to get food and not to commit felony, he was not entitled to instruction directing acquittal, if jury believed he entered house through open door to get some food only, but his theory was fully presented by general instruction to find him not guilty, unless his guilt was established by evidence beyond all reasonable doubt.

12. Burglary—Opening Door Wider Held "Breaking."—Where door was left only partly open, and it was necessary to open it wider to get in, there was a "breaking."

13. Burglary—Not Necessary to Instruct Upon Larceny.—It was not necessary to instruct upon larceny; burglary being complete when forcible nocturnal entry was made with intent to commit felony.

14. Burglary—Larceny—Larceny Not Degree of Burglary.—Larceny is not a degree of burglary.

15. Burglary—Failure to Instruct Upon Trespass Not Error.—In prosecution for burglary, where defendant admitted entering house to take food, court properly failed to instruct upon trespass; tres-

pass committed by entry through open door being merely civil trespass, and taking of food being part of larceny and no part of burglary.

16. Burglary—Jury had Right to Inflict Death Penalty.—Jury had right to inflict death penalty for burglary.

OWEN S. LEE and NEIL G. SULLIVAN for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Appellant was convicted of burglary and his punishment fixed at death. Some time in the early part of the night of December 11, 1923, the appellant entered the home of R. W. Thompson, about five miles from Lexington, in Fayette county. Lucian Thompson, a son of R. W. Thompson, had gone to Lexington and when he returned, between ten and eleven o'clock that evening, accompanied by a friend, Granville Manious, they entered the house through the kitchen. He became suspicious when he found the door of the kitchen open, and presently they heard the appellant in the dining room. Young Thompson, having obtained a match from Manious, struck it and entered the dining room, and as he did so, he saw the appellant fleeing from the dining room into the hall which adjoined it.

The appellant had on his shoulder a twenty-gauge Winchester repeating shotgun belonging to young Thompson, and as Thompson endeavored to seize the appellant, he threw it down on Thompson and pulled the trigger. Fortunately for Thompson, the gun was not loaded, and only snapped. Thompson succeeded in taking the gun away from the appellant and struck him with it several times. In the struggle, the parties had passed from the house out into the yard, and after that the gun was, in the struggle, knocked out of Thompson's hand, whereupon both appellant and Thompson drew their knives , and began to cut and stab each other. Appellant fared better than Thompson in his cutting and stabbing and soon had Thompson *hors de combat* from wounds inflicted upon him, the severity of which may be fairly well determined by the fact that young Thompson was in a hospital for about seven weeks as a result thereof.

Appellant admits entering the house, but alleges that at the time he did so, he was in a state of intoxication;

that he had drunk six ounces of Jamaica ginger and a pint of whiskey; that he was feeling bad, and entered the the house to see if he could get something to eat. He contends that he never snapped the shotgun at young Thompson, but that he picked up the gun off of a table and undertook to defend himself with it when young Thompson attacked him. He says he didn't go in there to steal anything, except a little something to eat, and that he had filled his pockets full of bread and meat when his presence was discovered. He insists that the repeating shotgun was lying on a table, whereas young Thompson says his gun was kept in the pantry, and the pantry closed. His account of the struggle doesn't differ materially from Thompson's account of it. The appellant, however, insists that he was acting on the defensive all the time, and that he believed young Thompson was trying to kill him and that his efforts with the gun and his use of his knife upon young Thompson were all for the purpose of extricating himself from the difficulty he was in, and avoiding serious injury at the hands of young Thompson.

The Commonwealth proved, and the appellant admitted, that he had been convicted of burglary on January 17, 1907, in the Fayette circuit court, and his punishment fixed at confinement in the penitentiary for five years. He also admitted that on January 18, 1907, he was convicted of burglary in the Fayette circuit court and his punishment fixed at confinement in the penitentiary for ten years, the punishment under the last verdict to begin after the expiration of the punishment under the first. Appellant also admitted that he was sent to the penitentiary for ten years by the Madison circuit court in March, 1891, for breaking into a storehouse.

Appellant admits entering this house by way of the kitchen door, but when asked if this door was fastened, made this answer: "No, sir, about that wide open. (Indicating.) There was a piece of carpet or something laying on the floor, a piece of carpet or something holding it open; I don't know what it was."

Mr. R. W. Thompson, when asked about the condition of this door, said that before he retired, which was about an hour before the appellant made his entry, he closed this door, but did not lock it. He merely pulled it to and latched it.

The value of the shotgun that appellant had when young Thompson saw him was shown to be $25.00 or more.

Appellant complains of the instructions given by the court. He was convicted under section 1159 of the Kentucky Statutes, as amended by chapter 97 of the Acts of 1922, which amendment was approved and became effective March 24, 1922. It is insisted for him that this act is unconstitutional for the reasons which we shall discuss. First, the title is attacked, which is as follows:

"An act to amend section 1159, Kentucky Statutes, Carroll's 1915 edition, relating to burglary and robbery."

By an act approved February 29, 1904, the General Assembly for that year, by chapter four of its Acts, adopted the 1903 edition of Carroll's Statutes as the law of Kentucky, and provided that any of the sections therein might be amended or repealed by the General Assembly by a reference to such sections, without giving the date or title of the act from which the section is taken, and similar acts have been passed since, adopting later editions. See chap. 104, p. 275, Acts 1922. Thus, the title of this act clearly indicated what the legislature was undertaking to do, and the effect of what the legislature did was to so amend section 1159 that, as regards burglary, it is now the law of Kentucky that:

"Every person guilty of burglary shall be punished with death, or confinement in the penitentiary for life, in the discretion of the jury."

The remainder of section 1159 was repealed. It seems unfortunate that chapter 97 of the Acts of the General Assembly for 1922 was not more carefully drawn; but the provisions of section 51 of the Constitution are mandatory, and the result is that the remainder of what had been section 1159 was repealed. In this connection, we deem it well to quote this, which this court has said of section 51 of our Constitution:

"The section now under consideration, however, is so short and readily understood that it would seem not difficult to so construe it as to render it an easy matter for the legislature to observe its provisions. But, notwithstanding this, the number of legislative acts in which its provisions have been disregarded is surprising. Time and again this court has found it necessary to declare legislative acts invalid on account of fatal defects arising under this section, and

time and again it has, with painstaking care, endeavored to point out the necessity for a substantial observance of its requirements, and fully explained, if indeed explanation was necessary, how they might be complied with.'' Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, 166 S. W. 1017.

In Board of Penitentiary Commissioners v. Spencer, this court set forth in great detail the effect of its various decisions construing section 51 of the Constitution, and among other things said:

"That when it is proposed to revise or amend one or more sections of the Kentucky Statutes, or an act, the body of the new act should contain the section or sections as they will read when revised or amended, if it is proposed to re-enact or leave in force any part of the section or sections that are amended or revised. If, however, it is intended to repeal one or more sections, then it is not necessary to set forth in the body of the act the section or sections repealed."

Appellant insists that the law under which he was convicted and his punishment fixed is unconstitutional because it violates article 8 of the Federal Constitution, but it has repeatedly been decided that the prohibition in the Eighth Amendment to the Federal Constitution applies only to the United States government, and the courts of that government. O'Neil v. Vermont, 144 U. S. 323, 12 Sup. Ct. 693, 36 L. Ed. 450; In re Kemmler, 136 U. S. 436, 10 Sup. Ct. 930, 34 L. Ed. 519; Pervear v. Commonwealth, 5 Wall. (72 U. S.) 475, 18 L. Ed. 608; McDonald v. Commonwealth, 173 Mass. 322, 53 N. E. 874, 73 Am. St. Rep. 293; State v. Blake, 157 N. C. 608, 72 S. E. 1080.

Appellant contends that the law is unconstitutional because it violates section 17 of the Constitution of the state of Kentucky, which is as follows.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishment inflicted."

Thus, this case presents the question: Is the death penalty a cruel punishment for the crime of burglary? It may be assumed that the death penalty, in a proper case,

is not cruel, within the prohibition of the Constitution. A similar question was decided in a similar way In re Kemmler, *supra*. It is a matter of common knowledge that the death penalty is not unusual, as it is employed in nearly all the states of this union, as well as by the United States government itself, and by the governments of nearly all the civilized world, as a punishment for crime. Counsel for appellant contends, however, that it is a cruel punishment for the offense of burglary, and if it is, then it is unconstitutional. Much difficulty has been experienced by both courts and text writers in attempting to define the scope of this and similar constitutional provisions. Some courts have thought that it was never intended as a limitation upon legislative discretion in determining the severity of the punishment to be inflicted, but rather refers to the mode of its infliction. Thus, in Aldridge v. Commonwealth, 2 Va. Cas. 447, it is said:

"That provision was never designed to control the legislative right to determine *ad libitum* upon the adequacy of punishment, but it is merely applicable to the modes of punishment."

Again, in Commonwealth v. Hitchings, 5 Gray (Mass.) 482, it is said:

"The question whether the punishment is too severe and was disproportionate to the offense, is for the legislature to determine."

But, in Sturtevant v. Commonwealth, 158 Mass. 598, 33 N. E. 648, it was said:

"This article is directed to courts, not to the legislature."

It may be, however, that the decisions in Massachusetts are based upon the peculiar language of the Constitution of that state, which is:

"No magistrate or court of law shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishment."

In State v. Williams, 77 Mo. 310, it is said:

"The interdict of the Constitution against the infliction of cruel and unusual punishments would apply to such punishments as amount to torture, or such as would shock the mind of every man possessed

of common feeling, such, for instance, as drawing and quartering the culprit, burning him at the stake, cutting off his nose, ears or limbs, starving him to death, or such as was inflicted by an act of Parliament as late as 22 Henry VIII, authorizing one Rouse to be thrown into boiling water and boiled to death for the offense of poisoning the family of the Bishop of Rochester. . . . If, under the statute in question (defining and providing punishment for the crime of obtaining money under false pretenses) a punishment by imprisonment for life of one who is convicted of the offense therein defined should be inflicted, it might well be said that such punishment would be excessive, or, rather, entirely disproportionate to the magnitude of the offense, yet, notwithstanding this, there is high authority for saying that 'the question whether the punishment is too severe and disproportionate to the offense is for the legislature to determine.' ''

In People v. Morris, 80 Mich. 634, 8 L. R. A. 685, 45 N. W. 591, it is said:

"The difficulty in determining what is meant by cruel and unusual punishment, as used in our Constitution, is apparent. Counsel for defendant claims that as properly understood, it means, when used in this connection, punishment out of proportion to the offense. If by this is meant the degree of punishment, we do not think the contention correct. When, in England, concessions against cruel and unusual punishments were first wrested from the crown, slight offenses were visited with the most extreme punishment and no protest was made against it."

In Garcia v. Territory, 1 N. M. 415, 418, the court said:

"The word 'cruel' as used in the amendatory article of the Constitution, was, no doubt, intended to prohibit a resort to the process of torture, resorted to so many centuries as a means of extorting confessions from suspected criminals under the sanction of the law. It was never designed to abridge or limit the selection by the lawmaking power of such kind of punishment as was deemed most effective in the punishment and suppression of crime."

This provision of the Constitution was before the Supreme Court of the United States in Wilkerson v. Utah, 99 U. S. 130, 25 L. Ed. 345. In that case the question was whether a judgment directing the infliction of the death penalty by shooting was cruel and unusual. The court said:

"Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to (4 Bl. Com. 377), where the prisoner was drawn or dragged to the place of execution, in treason; where he was disemboweled alive, beheaded and quartered, in high treason; cases of public dissection, in murder; and of burning alive, in treason committed by a female; and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution."

In re Kemmler, 136 U. S. 436, 34 L. Ed. 519, 10 Sup. Ct. Rep. 930, Kemmler, having been sentenced to death by electrocution, the question was whether the method adopted by the New York statute of inflicting the death penalty, which was by electrocution, was cruel and unusual, the court said:

"This declaration of rights (act of Parliament of 1688; 1 Wm. & Mary, chap. 2) had reference to the acts of the executive and the judicial departments of the government of England; but the language in question, as used in the Constitution of the state of New York, was intended particularly to operate upon the legislature of the state, to whose control the punishment of crime was almost wholly confided. So that, if the punishment prescribed for an offense against the laws of the state was manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition. . . . Punishments are cruel when they involve torture or a lingering death, but the punishment of death is not cruel, within the meaning of that word as used in the Constitution.

It implies there something inhuman and barbarous, something more than the mere extinguishment of life.''

It is true that, in both of the cases quoted from, the Supreme Court had before it for consideration, not the question of the severity of a punishment, but simply the question of the method of inflicting the death penalty; but in both those cases the court limits the meaning of the word ''cruel,'' as used in the Constitution, to something which involves torture.

If this be the test in all cases, then it must be clear that legislative discretion in determining the severity of punishment for crime is not to be interfered with by the courts, so long as all forms of torture are avoided.

In 1 Bishop, Criminal Law, section 947, it is said:

''Evidently, in reason, the punishments commonly inflicted at the time when the Constitution was adopted could not be deemed 'unusual' and no punishment is 'cruel' simply because it is severe, or 'cruel and unusual' because it is disgraceful.''

But mere torture, however slight, would be within the prohibition.

Mr. Tiedman, in his work on Limitations of Police Power (p. 21) says:

''But would the infliction of capital punishment for offenses not involving the violation of the right to life and personal security be such a 'cruel and unusual' punishment as that it would be held to be forbidden by this constitutional provision? It would seem to me that the imposition of the death penalty for the violation of the revenue laws, i. e., smuggling or the illicit manufacture of liquors, or even for larceny or embezzlement, would properly be considered as prohibited by this provision, as being 'cruel and unusual.' But, if such a construction prevailed, it would be difficult to determine the limitations to the legislative discretion.''

It would, indeed, seem to be a matter of great doubt, in view of the foregoing expressions of opinion on this subject, whether the courts, in any case, have the power to review legislative discretion in determining the severity of punishment for crime, so long as all forms of torture have been avoided.

Judge Cooley, however, in his work on Constitutional Limitations, draws a distinction which seems not to have been usually recognized. He says:

"It is certainly difficult to determine precisely what is meant by cruel and unusual punishment. Probably any punishment declared by statute for an offense which was punishable in the same way at the common law could not be regarded as cruel or unusual in the constitutional sense. And probably any new statutory offense may be punished to the extent and in the mode permitted by the common law for offenses of a similar nature. But those degrading punishments which in any state had become obsolete before its existing Constitution was adopted, we think, may well be held forbidden by it, as cruel and unusual." Cooley, Constitutional Limitations, 7th ed. 472.

If we understand the language of the learned author, a punishment provided by statute for an offense, of a kind as, for example, death, or imprisonment for life for burglary, is not prohibited by the constitutional provision, if at common law a like kind of punishment was authorized for offenses of a similar nature. If this be the test, then it is clear that the penalty prescribed in the case at bar is within the rule laid down; for burglary was a felony at common law, and punishable by death, but within the benefit of clergy. Early statutes, however, took away the benefit of clergy, and made the offense punishable in all cases by death. See 4 Blackstone, section 228.

While we have arrived at a conclusion that the discretion of the legislature in determining the adequacy of the punishment for crime is almost, if not quite, unlimited, yet such a conclusion is entirely unnecessary to an affirmance of this judgment. Assuming, for the sake of argument, that courts may, in extreme cases, review the discretion of the legislature in determining the severity of punishment, still we see no reason why this statute under consideration should be held to be unconstitutional by reason of its severity.

It is hardly necessary to recall the incidents attending the ordinary burglary, which is a matter of common history, to convince everyone that the punishment prescribed by this statute is a salutary provision and eminently suited to the offense which it is designed to meet. Burglaries are committed by armed and desperate men,

determined upon the accomplishment of their purpose, and nothing will prevent the consummation of their design, not even the necessity of taking human life. Indeed, the fact that Thompson is alive today, we firmly believe, is due to the fact that this gun was not loaded, or to the appellant's failure, in his stabbing of Thompson, to reach a vital spot.

The appellant's manner of committing this burglary was but a sample of what is being done by those engaged in that nefarious business in all parts of this country, except that he undertook this single-handed.

It is true that in this case the appellant did not succeed in accomplishing his purpose fully. The gun which he had evidently intended to carry away with him was wrested from his hand before he succeeded in so doing. Ordinarily, the death penalty for an attempted commission of an act would be a most severe punishment; but, taking into consideration all the circumstances usually attending a burglary, we cannot say that we deem the death penalty in any degree excessive, as compared with the gravity of the offense, if the death penalty is to be inflicted for any violation of the criminal law.

This punishment, however, is all that could possibly be done to the man, and in view of its severity, we have examined this record with great meticulosity for possible errors. This brings us to a consideration of the correctness of the instructions given; for, it being the duty of the court in criminal cases to give the whole law of the case, as warranted by the facts proven, it is immaterial what instructions were asked for or offered. If the instructions given do not accurately state the law, or the court fails to give an instruction on a point of law upon which the defendant is entitled to have the jury instructed, the case must be reversed; otherwise not.

Was the appellant entitled to an instruction telling the jury that if he entered the house through an open door, that in that event, they should acquit him?

In the case of Duke v. State of Texas, reported in 42 Tex. Cr. R. 3, 57 S. W. 652, in a similar case, the court of criminal appeals of the state of Texas decided that the defendant in that case was entitled to such an instruction. The criminal law of Texas, however, is not exactly the same as the criminal law of Kentucky, and their procedure is different from the procedure of this state. The courts of Texas are required to instruct at much greater

length than the courts of this state, and upon matters upon which the courts of Kentucky are not required to instruct.

Before the statute was passed allowing the accused in a criminal case to testify, it was held in several homicide cases that if there were no eye-witnesses to the killing except the accused, or circumstantial evidence sufficient to establish with reasonable certainty how it occurred, the court should instruct the jury upon every possible feature of the case, e. g., self-defense, manslaughter, accidental killing, etc., and perhaps since then a few isolated cases may be found adhering to the old rule; but in recent years the courts have followed the more sensible rule of giving no instruction unless there was evidence to support it, and it was necessary in order to present to the jury the defendant's theory of the case, or that of the Commonwealth.

"The terms 'theory' and 'theories' used in pleading relate to the basis of liability or ground of defense." 12 Ind App. 185; South Bend Mfg. Co. v. Liphart, 39 N. E. 908.

Ordinarily, the defendant's theory of the case is simply "not guilty" and this theory is fully presented by the instruction to acquit him unless he is proven guilty beyond all reasonable doubt.

However, there are cases where the accused admits one or more of the essential elements of the offense charged, but attempts to avoid conviction by proving facts or circumstances to excuse what he did, and under such circumstances, his theory of the case should be set out in a special instruction.

Thus, if A is charged by indictment with the murder of B by shooting him, if A, by his evidence, admits the shooting of B, but claims that he shot in necessary self-defense or that he shot him accidentally or that he shot him, but that B did not die of the wound inflicted, or that he shot him, but that at the time he did so he was insane, then, in each of those instances, A would be entitled to an instruction setting out specifically his theory of the case.

A burglary consists of a forcible, nocturnal entrance into a dwelling for the commission of a felony. There are two essential elements of burglary. The jury had to believe the appellant guilty of two essential things to convict him of burglary. First, a forcible nocturnal entry

of Thompson's dwelling, and, second, an intent to commit a felony therein.

The appellant doesn't admit the forcible entry, but claims he entered through an open door, nor does he admit that he intended to commit a felony. Therefore he is not entitled to an instruction directing the jury to acquit him if they believe he entered the house through an open door, to get some food only. That theory of his case is fully presented to the jury by the general instruction to find him not guilty unless his guilt is established by the evidence, beyond all reasonable doubt. This court so held in a similar case. See Scott v. Commonwealth, 24 Rep. 889, 70 S. W. 281.

In the case of King v. Commonwealth, reported in 187 Ky. 782, 220 S. W. 755, King was charged with the murder of his wife by shooting her. He denied that he shot her. He was convicted and upon his appeal he insisted that the jury should have been instructed on the subject of involuntary manslaughter and self-defense. This court held that he was not entitled to such an instruction.

In the case of Joy v. Commonwealth, 203 Ky. 426, 262 S. W. 585, Joy was charged with embezzlement. He denied the commission of the offense, and claimed that he was robbed. He was convicted and upon an appeal he insisted that he was entitled to an instruction directing the jury to find him not guilty, if it believed from the evidence that an unknown man, after putting him in fear, had robbed the cash drawer of the money which he was accused of embezzling. The court held he was not entitled to have the jury so instructed.

In Wallace v. Commonwealth, 187 Ky. 775, 220 S. W. 1051, the defendant was charged with housebreaking. He denied all knowledge of the crime, and sought to show by the evidence that at the time the crime was commited he was in the state of Missouri. He was convicted and upon his appeal to this court he strenuously insisted that his *alibi* should have been set out in a special instruction, but this court held otherwise, and the judgment was affirmed.

It will be observed in all these cases that the accused failed to admit any of the essential elements of the offense charged. If the appellant had said that he entered this residence, but did so because he was pursued by a man of whom he was afraid, and that he opened this door and sought refuge in this residence, or, if he had said that he opened the door and entered the house, but that

he was acquainted with Mr. Thompson and had worked for him, and was accustomed to enter the house when hungry to get something to eat, or that he opened the door, and entered the residence because he saw a peculiar light in it, and thought it was on fire, in each of those instances there would have been more grounds to sustain his contention; but he denies both the forcible entry and the felonious intent, and, under the rule, was not entitled to any instruction to acquit him if he entered through an open door.

On the trial of this case the court gave this instruction to the jury:

> "The jury are instructed that if the defendant in entering the house in question, if he did so, met with any obstruction, however slight, to his entrance and removed the same by his own act, that constitutes a breaking in the meaning of the law."

Was this instruction erroneous? Should the court have said to the jury that it was not a breaking if the defendant pushed a little further open an already partly open door?

Now, it will be observed that the appellant doesn't say that he had to push this door further open. He merely says that the door was open about that much—indicating —which, of course, may have meant something to the jury that saw the demonstration, but means absolutely nothing to this court; but he continues the sentence and says that he entered through an open door. Even if the record had disclosed that in entering he had to push this door a little further open, would that have been a breaking?

There was a time when "night air" was considered dangerous to health and people kept their doors and windows tightly closed at night, lest this "night air" might cause them to sicken or to die. At that time, any one who left his window partly open or his door slightly ajar, was considered so negligent as to be beyond the protection of the law, and in the case of Rose v. Commonwealth, 19 R. 272, 40 S. W. 245, this court held that the further opening of a window partially open, was not a breaking, but our knowledge of the laws of hygiene has increased to that extent that night air is no longer feared. The law is not a fixed and crystallized thing, but grows and expands with human progress, and as the reason for the rule has disappeared, the rule went with it.

If a citizen now desires to leave his window partially open, that he may have fresh air in the nighttime, then no prowling burglar, with felonious intent, can push that window further open and enter the citizen's home and say that he did not break in. Therefore, we approve the instruction given.

In Collins v. Commonwealth, 146 Ky. 698, 143 S. W. 35, 38 L. R. A. (N. S.) 769, it was held that opening a screen door was a breaking although the screen door was not fastened. This court knows that many of the poorer people of our state do not have their doors and windows screened, and yet these people may desire to have fresh air in the nighttime. If they do, their homes shall be just as secure against prowling burglars as the home of their wealthier neighbors whose windows and doors have been screened.

The most elaborate argument in support of the foregoing view is found in State v. Lapoint, 87 Vt. 115, 88 A. 523, 47 L. R. A. N. S. 717, Ann. Cas. 1916C 318, where the court says:

"But this is not the rule in other branches of the criminal law; and we do not see that the fact that this crime consists merely of an entrance with intent to commit a further crime calls for any distinction. A man may recklessly and unnecessarily pass through a group of men excited to the point of violence, but if he is assaulted the penalty will follow. A man may issue a check so carelessly drawn as to afford an attractive opportunity for alteration, but the man who makes the alteration will be guilty of forgery. A woman may associate with men under circumstances of great imprudence, but if a criminal advantage is taken of her situation the act will nevertheless be rape. Then why should not one who is tempted to enter a dwelling with felonious intent by seeing a door which has carelessly been left slightly ajar, be held guilty of burglary?"

The court was not required to give an instruction upon larceny. When appellant made a forcible nocturnal entry of this dwelling with intent to commit a felony therein, the burglary was complete, and not one of the acts necessary to constitute larceny had then taken place.

This court has held in Thomas v. Commonwealth, 150 Ky. 374, 150 S. W. 376, that larceny is not a degree

of housebreaking, and we now hold that larceny is not a degree of burglary.

The next question that arises is, was it the duty of the court to instruct upon trespass? By the appellant's own admission, he was guilty of two trespasses. He committed one trespass when he entered the house, and another when he took the meat and bread. In a revision of the criminal law of Kentucky, made by Toulmin & Blair, pursuant to an act approved December 19, 1801, it is said:

> "There must be an actual breaking, and not merely such an entrance as might constitute a civil trespass. It is not such a breaking as will amount to the crime of burglary for a man to enter into a house by a door which he finds open." Criminal Law of Kentucky, Toulmin & Blair, vol. 1, p. 203.

This doctrine is supported by 1st Hawkins' Pleas of the Crown 160.

> "There must in general be an actual breaking; not a mere legal *clausum fregit* (by leaping over invisible ideal boundaries, which may constitute a civil trespass), but a substantial and forcible irruption." 4th Blackstone 226.

From these authorities it is evident that the trespass committed by entry through the open door is merely a civil trespass, and no part of the burglary. The trespass committed when he took the bread and meat was a part of that larceny, and hence no part of the burglary. It therefore follows that no instruction should have been given upon trespass.

The burglar has been dreaded throughout human history, and upon him most severe punishments have ever been inflicted. Under the code of Hammurabi the Babylonians killed and buried a burglar in front of the breach he had made. The Mosaic law provided no blood-guiltiness for the thief killed while breaking in. Ex. 22:2, 3. The law of Athens made burglary a capital crime. 4th Blackstone, 228.

The punishment meted out to the appellant is severe, but the crime of which he was convicted is most detestable. Burglars have all the advantage of the darkness of the night; they are armed and alert, while the proper occupants of the burglarized house are unarmed and

asleep; their apprehension is very difficult, and their identification always all but impossible.

The General Assembly had the right under the Constitution to make burglary a capital offense, and the jury had the right to impose the death penalty.

We have been unable to find any error in the record.

The judgment is affirmed.

The whole court sitting, except Judge Settle.