**Darick Demorris WALKER, Plaintiff,**

v.

**Gene M. JOHNSON, et al., Defendants.**

**No. 1:05–CV–934 CMH TRJ.**

United States District Court,
E.D. Virginia.
Alexandria Division.

Sept. 11, 2006.

---

Lara Ann Englund, Wilmerhale, Washington, DC, Coale Parker Anderson, Wilmer Cutler Pickering Hale & Dorr LLP, McLean, VA, for Plaintiff.

Richard Carson Vorhis, Office of the Attorney General, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

This matter comes before the Court on parties' cross Motions for Summary Judgment. Plaintiff received a sentence of death in accordance with the jury's verdict on October 8, 1998. Plaintiff challenges the constitutionality of the lethal injection process Defendants will use to execute him. U.S. Const. amend. VIII. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (2000) because Plaintiff requests injunctive relief pursuant to 42 U.S.C. § 1983.

Virginia uses three drugs in the lethal injection procedure to induce death. First, two grams of sodium thiopental are administered. Sodium thiopental is a barbiturate that induces sleep within thirty to sixty seconds. This dose is approximately five times the normal amount that would be administered to a surgical patient in a non-execution setting. This dose should cause the inmate to fall asleep and be unconscious for about two hours. The probability of the inmate regaining consciousness in the next ten minutes is 3/1000 of one percent (0.003%). The probability of the inmate regaining consciousness in the next twenty minutes is less than 1/100 of one percent (0.01%).

Next, fifteen to twenty-five milliliters of saline is administered to flush the line. This prevents the possibility of any interaction between the first and second drugs in the intravenous (IV) line. If the sodium thiopental and pancuronium bromide (the second drug) were to interact before entering the inmate's body, then the sodium thiopental would not work properly to induce unconsciousness in the inmate.

Second, fifty milligrams of pancuronium bromide are administered. Pancuronium bromide is a neuromuscular blocking agent that paralyzes all muscles except the heart within two to four minutes. This dose is approximately six times the normal amount that would be administered to a surgical patient in a non-execution setting. This quantity of pancuronium bromide will cause an inmate to suffocate. Next, fifteen to twenty-five milliliters of saline is administered to flush the line.

Finally, 240 milliequivalents of potassium chloride are administered. Potassium chloride is a drug that induces cardiac arrest. If given to a conscious person, potassium chloride would cause a great deal of pain.

In Virginia, the average time it takes from start to finish of a lethal injection execution is less than four and a half minutes. The longest procedure took thirteen minutes and that was the first one attempted in the state.

If death does not occur within ten minutes after the first set of drugs is administered, the protocol requires a second set of pancuronium bromide and potassium chloride to be administered. A second set of potassium chloride has been administered in nine of the sixty-six lethal injection executions in Virginia. The second set of potassium chloride was administered within ten minutes of the administration of the initial set. Death occurred shortly after the administration of the second set of potassium chloride in all nine cases.

The execution takes place in a one room chamber. The inmate is strapped to a gurney in the front of the chamber, and the executioner, IV team, and the physician who pronounces death are behind a curtain in the rear of the chamber. The curtain has two holes so the executioner and IV team can observe the inmate during the administration of the drugs.

The IV team members have backgrounds in relevant medical fields and train on placing IV lines. The IV team places two IV lines in the inmate. The IV lines are connected to several feet of tubing that allows the drugs to be administered by the executioner from behind the curtain. The IV team checks the IV lines by using a saline drip. Once the IV team verifies that the IV line works, the IV team signals the executioner and moves behind the curtain to continue to monitor the saline drip.

The executioner has training to determine whether the IV line is flowing properly as he administers the drugs. Also, the executioner can see the inmate and the IV line to determine whether the drugs are entering the inmate's body properly.

If the first IV line is not working properly, the executioner can switch to the second IV line.

The Supreme Court held that a condemned prisoner may raise an Eighth Amendment "cruel and unusual punishment" challenge to a specific ancillary medical procedure that is not a mandatory part of the execution protocol pursuant to 42 U.S.C. § 1983. *Nelson v. Campbell*, 541 U.S. 637, 644, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004). In *Nelson*, the state wanted to use a "cut-down" procedure to access the inmate's veins and inject the lethal drugs. *Id.* at 641–42, 124 S.Ct. 2117. The Court noted that the inmate's challenge to the "cut-down" procedure was not a challenge to execution by lethal injection in general because the "cut-down" procedure was not part of state's statutorily mandated execution protocol. *Id.* at 645, 124 S.Ct. 2117.

More recently, the Supreme Court addressed the issue of whether the drug cocktail used in carrying out a lethal injection sentence could be challenged under § 1983 as opposed to a petition for habeas corpus. *Hill v. McDonough*, —— U.S. ——, 126 S.Ct. 2096, 2101, 165 L.Ed.2d 44 (2006). The Court held that the condemned can challenge the drug cocktail under § 1983 so long as the petitioner accepts the inevitability of execution. *Id.* at 2102. The Court also acknowledged the potential for abuse that could be found in piecemeal litigation aimed at perpetual delay. *Id.* at 2102.

■ The Fourth Circuit adopted the ruling in *Nelson* and permitted a § 1983 challenge to the drugs used in Virginia's lethal injection protocol because it was not a challenge to lethal injection in general. *Reid v. Johnson*, 105 Fed.Appx. 500, 503 (4th Cir.2004) (unpublished). Further, the court found that because the challenged protocol was only a Department of Correc-

tions policy and not a statute or regulation, the court was not overturning a statutory sentence. *Id.* Thus, Plaintiff's case is properly before the Court under § 1983 and is ripe for summary judgment.

A court should grant summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must regard the evidence in the most favorable light to the nonmoving party. *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.,* 377 F.3d 408, 418 (4th Cir.2004). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) (citation omitted). However, "[w]hen considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.*

■ In *Nelson,* the Court defined a § 1983 challenge to the procedure used in an execution as a "conditions of confinement" claim. *Nelson,* 541 U.S. at 643–44, 647, 124 S.Ct. 2117; *see also, Hill,* 126 S.Ct. at 2101. To state a conditions of confinement claim, a plaintiff must satisfy two prongs:

> [f]irst, the deprivation alleged must be, objectively, "sufficiently serious," ...; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities" ... second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." ... To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." ... In prison-conditions cases that state

of mind is one of "deliberate indifference" to inmate health or safety.

*Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted).

■ Under the first prong, Plaintiff has not alleged an objective substantial risk of harm. Plaintiff cannot avoid the fact that his sentence calls for his execution. As an inescapable matter of fact, an execution causes some pain and suffering for an inmate. *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947). The mental anguish and accompanying pain of death cannot be totally averted by any method of execution. It is not within the realm of this Court's jurisdiction to dictate how a state carries out a lawful death sentence unless the execution procedure will subject Plaintiff to some objectively cruel or unusual punishment.

■ Plaintiff correctly references the Supreme Court when it stated "the Court has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg v. Georgia,* 428 U.S. 153, 171, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This interpretation must still be limited within the confines of the federal judiciary's jurisdiction. The Court will not usurp the legislature to determine whether there is a more humane execution procedure if the current procedure does not violate the Constitution. Here, Plaintiff has not shown that there is some individualized problem that will cause him to suffer "torture or lingering death." *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In fact, under Virginia's lethal injection protocol, the state renders an inmate unconscious before he is

executed, helping to assuage the accompanying pain of death.

Plaintiff cannot rely on the possibility of something going wrong during an execution as the grounds for substantial risk of harm. *Louisiana ex rel.,* 329 U.S. at 464, 67 S.Ct. 374; *Beardslee v. Woodford,* 395 F.3d 1064, 1075 (9th Cir.2005); *Reid v. Johnson,* 333 F.Supp.2d 543, 551 (E.D.Va. 2004). The only risk in the Virginia protocol occurs if a mistake or accident happens. If the state adheres to the protocol, Plaintiff will be unconscious when the potassium chloride causes him to die from cardiac arrest. Thus, Plaintiff will not suffer torture or lingering death. *In re Kemmler,* 136 U.S. at 447, 10 S.Ct. 930.

Plaintiff argues that the sodium thiopental may not be properly administered to him before the potassium chloride is administered and takes effect. If this happened, Plaintiff would feel a great deal of pain. For this to occur, the sodium thiopental would fail to enter the bloodstream, but the potassium chloride would enter his bloodstream. This outcome cannot reasonably be expected because all three drugs are administered through the same IV lines. Plaintiff's argument relies upon an accident or a mistake, not a reasonably foreseeable problem with the protocol.

Plaintiff also points to problems in prior executions as evidence that the protocol is flawed. Specifically, Plaintiff highlights nine lethal injection executions in which a second set of potassium chloride was administered. In each of those nine instances, the inmate died shortly after the administration of the second set of potassium chloride. Plaintiff has not shown that any of these nine inmates were conscious when the second set of potassium chloride was administered to them. Nor has Plaintiff shown that the second set of potassium chloride had any more or less effect than the first set, so it appears that the drugs

and the IV lines worked properly in these nine instances.

Plaintiff further argues that steps need to be taken to monitor the depth of an inmate's anesthesia because pancuronium bromide could paralyze a conscious inmate and mask the fact that he feels pain when the potassium chloride is administered. However, it is extremely unlikely that the inmate is conscious after receiving such a high dose of sodium thiopental. An execution by lethal injection is not a medical procedure and does not require the same standard of care as one. Thus, Plaintiff's argument requesting Virginia to monitor the anesthetic depth of an inmate fails.

■ Even if Plaintiff could overcome the first prong, he fails to show that Defendants acted to deliberately disregard the risk of serious harm in the lethal injection procedure.

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety." ... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Id.* at 844–45, 114 S.Ct. 1970.

The evidence before the Court shows that Defendants have gone to great

lengths to identify and minimize the risk of error in the protocol. For example, there are many safeguards such as redundancies in the equipment, the placing of two working IV lines, the high dosage of lethal drugs to ensure that the drugs cause death quickly, the manner in which the drugs are prepared and handled, the qualifications of the execution team members, and the repetitive training required of them. Furthermore, the average time from the first injection until death is pronounced is only four minutes and twenty seconds which shows that the officials have tailored the protocol to avoid lingering death.

Plaintiff produced no credible evidence that Defendants knowingly and unreasonably disregarded an objectively impermissible risk of harm to Plaintiff. *Farmer*, 511 U.S. at 846, 114 S.Ct. 1970. There is no threat of Defendants using a "cut down" procedure on Plaintiff as in *Nelson*. There is no threat that Defendants will deviate from the normal protocol during Plaintiff's execution. Thus, Plaintiff has not satisfied the evidentiary requirements of the second prong of a conditions of confinement claim, and his request for injunctive relief fails.

Finally, any discussion by Plaintiff about the standards of animal euthanasia has no bearing on death penalty matters and is rejected by the Court. For these reasons, the Court finds that summary judgment should be granted for the Defendants, and this case should be dismissed. An appropriate order shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgement is DENIED, and this case is DISMISSED.