David Ray **HARRIS**, Plaintiff,

v.

Gary **JOHNSON**, et al., Defendants.

Civil Action No. H–04–CV–1514.

United States District Court,
S.D. Texas,
Houston Division.

June 29, 2004.

Thomas M. Farrell, Nickens Keeton et al, Houston, TX, for plaintiff.

Gena Blount Bunn, Texas Attorney General, Austin, TX, for defendants.

### *ORDER*

GILMORE, District Judge.

David Ray Harris, a death row inmate with an execution date of June 30, 2004, filed suit under 42 U.S.C. § 1983. Harris complains that the protocol for lethal injection used by the State of Texas violates the Eighth and Fourteenth Amendments' prohibition of cruel and unusual punishment.

On April 30, 2004, this Court dismissed Plaintiff's case without addressing the merits, in reliance upon *Martinez v. Tex. Ct. of Crim. Appeals,* 292 F.3d 417, 421 (5th Cir.2002). (Instrument No. 5). On June 23, 2004, the Fifth Circuit issued its decision reversing and remanding the case for further proceedings in light of the Supreme Court's ruling in *Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), which was decided in

the interim. (Instrument No. 16). In *Nelson*, the petitioner brought an Eighth Amendment claim pursuant to § 1983, arguing that Alabama's use of a "cut-down" procedure in administering lethal injection violated his right to be free from cruel and unusual punishment. *Nelson*, 124 S.Ct. at 2121. The question before the Court was whether § 1983 was an appropriate vehicle for Nelson's Eighth Amendment claim seeking a temporary stay of his execution and permanent injunctive relief of the specific execution protocol involving the "cut-down" procedure. *Id.* at 2120. The Supreme Court answered that question in the affirmative but refrained from holding that method of execution claims should be categorized as § 1983 claims generally. *Id.* at 2120, 2123.

The Court of Appeals remanded the case at bar for further consideration in light of *Nelson*, but the court did not issue a stay of Mr. Harris's June 30 execution date. (*Id.*). On June 23, 2004, this Court issued an order to the State to refile its brief in response to Plaintiff's § 1983 action before 12 p.m. on Friday, June 25, 2004 and to the Plaintiff to file any reply brief by 12 p.m. Friday, June 25, 2004, as well. (Instrument No. 12). On June 24, 2004, Plaintiff Harris filed his Request for TRO and Post–Remand Relief with this Court. (Instrument No. 13). Defendants responded to this motion on June 28, 2004. ("Defendants' Opposition to Plaintiff's Request for TRO"). Defendants filed their Motion to Dismiss with Brief in Support on June 25, 2004. (Instrument No. 14). Plaintiff responded to the motion on June 25, 2004. (Instrument No. 17).

The State of Texas executes felons on Death Row through lethal injection of three separate chemical substances: (1) sodium thiopental, or sodium pentothal, which is a barbiturate; (2) pancuronium bromide, or Pavulon, which is a neuromus-cular blocking agent; and (3) potassium chloride, which arrests pulmonary function and causes oxygen deprivation, causing death. (Instrument No. 13, Exhibit A, at 7–8). Plaintiff claims that the neuromuscular blocker "paralyzes all skeletal or voluntary muscles, but has no effect on awareness, cognition, or sensation," such that the condemned will appear "serene and pain-free" while he is, in fact, experiencing "excruciating pain." (*Id.*) Plaintiff asserts that this "chemical cocktail ... will likely cause Mr. Harris consciously to suffer excruciating pain and an agonizing death, while appearing to die peacefully." (*Id.*, at 8). Accordingly, Mr. Harris challenges this method of lethal injection as a violation of the Eighth Amendment to the United States Constitution.

Plaintiff asserts this claim pursuant to 42 U.S.C. § 1983. Defendants; however, assert that Plaintiff's complaint "is correctly construed as a challenge to Texas' execution process, which sounds in habeas, not civil rights." (Instrument No. 14. at 2). Defendants argue that "material differences" exist between Plaintiff's claim and the claim at issue in *Nelson*. (*Id.*, at 3–4). Therefore, Defendants argue that *Nelson* has no bearing on this case and that Plaintiff's claim must be dismissed as a successive federal writ, as required by 28 U.S.C. § 2244(b)(2). (*Id.*, at 7).

The Court now considers the arguments presented by the parties and addresses the Fifth Circuit's mandate that this Court give emergency attention to this matter and address Plaintiff's claim in light of *Nelson*.

## I.

"Section 1983 authorizes a 'suit in equity, or other proper proceeding for redress' against any person who, under color of law, subjects, or causes to be subjected, any citizen of the United States

... to the deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Nelson,* 124 S.Ct. at 2122. Relief under § 1983 must yield, however, to the federal habeas corpus statute, "where an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence." *Id.* Traditionally, claims challenging the *fact* of a prisoner's conviction or the *duration* of his sentence fall within habeas, while claims challenging the *conditions* of a prisoner's confinement fall within § 1983. *Id.* As the Supreme Court stated, however, "[n]either the 'conditions' nor the 'fact or duration' label is particularly apt" in a "suit seeking to enjoin a particular means of effectuating a sentence of death." *Id.* at 2123. In the case at bar, Mr. Harris challenges the particular method used by Texas in administering lethal injection; he does not challenge the duration of his sentence, the conditions of his confinement, or even the actual form of execution.

The Supreme Court suggests, however, that a suit seeking to enjoin a particular method of effectuating a death sentence could, potentially, call into question the "fact" or "validity" of the death sentence itself. *Id.* For instance, "[i]n a State such as Alabama, where the legislature has established lethal injection as the preferred method of execution, a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself." *Id.* (citations omitted). While the Supreme Court refused to categorize method of execution claims generally, the Court articulated three factors that may be used as guidance by the trial courts to determine whether a petitioner's claim amounts to a challenge to the fact of the sentence itself, thus requiring that the district court construe the claim as falling under habeas and not under § 1983. *Id.* at 2123–24. These factors are: (1) whether the challenged protocol is a statutorily mandated part of the execution; (2) whether the challenged protocol is necessary for administering the lethal injection; and (3) whether the petitioner is seeking to preclude execution by alternative methods. *Id.*

## A.

■ The first element to which the Supreme Court turned its attention was whether the contested method of execution was statutorily required. In *Nelson,* the Court determined that the contested method was not statutorily required by the State of Alabama, nor was any "duly-promulgated regulation[ ] to the contrary" offered to the Court. *Nelson,* 124 S.Ct. at 2124. The Texas statute regulating the execution of a convict provides,

> Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time after the hour of 6 p.m. on the day set for the execution, by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the Director of the institutional division of the Texas Department of Criminal Justice.

Tex.Code Crim. Pro. Art. 43.14. The statute clearly does not require a particular mixture of drugs in its mandate to execute by lethal injection. Nor has the State provided the Court with any "duly-promulgated regulation" on the topic, citing security concerns as its rational for secrecy.

The Supreme Court suggests that this factor is important because a finding of unconstitutionality on a statutorily mandated execution method "would require statutory amendment or variance, imposing significant costs on the State and the administration of its penal system." *Nelson,* 124 S.Ct. at 2123. The Court also cited *McCleskey v. Zant,* 499 U.S. 467, 491,

111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), in which the Court stated that "the power of a State to pass laws means little if the State cannot enforce them," as further explanation for the import of a statutory inquiry. *Nelson,* 124 S.Ct. at 2123. There is no statutory mandate in the case at bar, therefore there is no attendant risk of stripping the State of the power to enforce its laws. In addition, the State makes no argument that it would be subjected to significant costs if a change was mandated.

## B.

■ The second factor to consider is the necessity of the contested protocol to the administration of lethal injection. The Supreme Court held in *Nelson* that

focusing attention on whether petitioner's challenge ... would *necessarily* prevent [the State] from carrying out its execution both protects against the use of § 1983 to circumvent any limits imposed by the habeas statute and minimizes the extent to which the fact of a prisoner's imminent execution will require differential treatment of his otherwise cognizable § 1983 claims."

*Nelson,* 124 S.Ct. at 2124–25 (emphasis in original). In assessing necessity in *Nelson,* the Supreme Court focused its attention on whether the Petitioner's challenge to the procedure used in his execution "would *necessarily* prevent Alabama from carrying out its execution." *Nelson,* 124 S.Ct. at 2124–25 (emphasis in original). The Court noted, specifically, that "[m]erely labeling something as part of an execution procedure is insufficient to insulate it from a § 1983 attack." *Id.* at 2123.

Plaintiff Harris argues that the particular combination of chemicals used by Texas is not "the only available means of causing death by lethal injection," and is, therefore, not necessary to the imposition of his death sentence. (Instrument No. 13, Exhibit A, at 8). Mr. Harris asserts that "[t]here exist lethal-injection alternatives

that would not cause undue pain and suffering" and that the "State's insistence on using this method of execution will inflict on Mr. Harris unnecessary and gratuitous suffering." (*Id.,* at 8–9). Two such alternative methods are the protocol used in New Jersey, which does not include the neuromuscular blocking agent pancuronium bromide, or a protocol that includes a higher dosage of barbiturate. (Instrument No. 13, at 2). The Plaintiff is explicit on this point: he "is not seeking, in this case, to preclude the State of Texas from executing him by lethal injection. Harris seeks only to enjoin the use of the particular chemical cocktail described in his complaint, and that relief would not foreclose lethal injection by alternative means." (Instrument No. 17, at 2) (emphasis removed).

The State argues to the contrary, stating, "Harris' complaint, which seeks to permanently enjoin use of Texas' method of execution as it has existed and been employed since 1982, amounts to a challenge to the fact of the sentence itself. Because the complaint 'would necessarily imply the invalidity of his ... sentence,' the complaint should be construed as habeas." (Defendants' Motion to Dismiss with Brief in Support, at 3) (citing *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). The State fails to support its necessity argument, however, and only reasserts time and again the categorical conclusion that the complaint necessarily implies the invalidity of the death sentence. (*See also* Defendants' Opposition to Plaintiff's Request for TRO, at 3). The only other argument that may be gleaned from Defendants' briefing on this issue is that the protocol is necessary to Texas' method of execution because the protocol has been employed since 1982.

The Supreme Court stated in *Nelson* that the fact that "venous access is a necessary prerequisite does not imply that a particular means of gaining such access is likewise necessary." *Nelson*, 124 S.Ct. at 2123. This Court believes that the case at bar presents an apt parallel: the fact that the administration of a lethal dose of drugs is a necessary prerequisite does not imply that a particular formula or mixture of drugs is likewise necessary. Alternative means of lethal injection most certainly exist, therefore the particular combination of drugs used by Texas cannot be considered necessary.

Further, the Supreme Court stated in *Nelson* that "the gravamen of petitioner's entire claim is that use of the cut-down would be *gratuitous*." *Nelson*, 124 S.Ct. at 2123 (emphasis in original). Whether the contested protocol is gratuitous, thus, has a bearing on the necessity consideration. Something that is "gratuitous" is "unnecessary or unwarranted, unjustified." WEBSTER's II NEW RIVERSIDE UNIVERSITY DICTIONARY 545 (3d ed.1994). The definition "unnecessary" is too circular for a necessity analysis, but the definitions "unwarranted" and "unjustified" are helpful. No reason has been produced in support of this particular protocol's justification. No explanation has been provided for its superiority over other potential protocols. The State simply makes a conclusory assertion that the Court should trust them because they have determined that their unpublished protocol is the best method. And given the fact that pancuronium bromide, the second drug, has not been determined to be necessary to cause death, its selection can, therefore, be considered, unwarranted, unjustified, and gratuitous.

Finally, the argument that a method of execution is necessary simply because it has been used for the past 22 years carries no weight with this Court. Texas' chosen method of execution from 1819 to 1923 was death by hanging, and its chosen method of execution from 1923 to 1977 was death by electrocution. TEX. DEP'T OF CRIM. J., DEATH ROW FACTS, *available at* http://www.tdcj.state.tx.us/stat/drowfacts. htm. One method lasted for 104 years, the other lasted for 54 years, and both were eventually retired. To argue that 22 years of use proves necessity is disingenuous. Were constitutionality to become fixed solely on the basis of a law's duration, many blatantly unconstitutional institutions would still survive today. Longevity will not carry this point. Accordingly, because there are alternative drug protocols to administer lethal injection and because the State has provided no evidence to the contrary, the Court finds that the particular drug protocol for lethal injection applied by the State of Texas is not necessary to the application of a death sentence in this State.

### C.

■ The third factor to consider when determining whether a challenge to a method of execution comprises a challenge to the fact of the sentence is whether the petitioner is "unable or unwilling to concede acceptable alternatives" to the contested method. *Nelson*, 124 S.Ct. at 2123–24. Before the Supreme Court, Nelson asserted that alternatives existed to the method of execution which would satisfy his prayer for relief and would allow the State to proceed with the execution. *Id.* at 2124. Similarly, in the case at bar, Mr. Harris is willing to concede to acceptable alternatives and discusses them in his filings with this Court. Harris states, "There exist lethal-injection alternatives that would not cause undue pain and suffering." (Instrument No. 13, Exhibit A, at 8). In fact, the Plaintiff presents two alternative options that would satisfy his claim for relief: (1) the State of Texas could adopt the method of lethal injection

utilized by the State of New Jersey, a method which does not call for the use of pancuronium bromide, or (2) the State of Texas could administer a higher dosage of barbiturate to the drug cocktail already utilized in this state. (Instrument No. 13, Exhibit B, at 3–4 n. 1).

In his Original Complaint, Plaintiff "requests that this Court grant a preliminary and a permanent injunction barring Defendants from executing Plaintiff *in the manner they currently intend.*" (Instrument No. 1, at 5) (emphasis added). In his Request for TRO and Post–Remand Brief, Plaintiff "emphasizes that the restraining order and the injunction he seeks would *not* preclude Defendants from employing alternative means of lethal injection, such as the New Jersey protocol … or a chemical cocktail that includes a higher dosage of barbiturate." (Instrument No. 13, at 2) (emphasis in original). In the Brief for Appellant filed with the Fifth Circuit, Mr. Harris states that he "does *not:* challenge his conviction or his sentence; attack the method of carrying out executions (i.e., lethal injections) used in Texas; seek a stay of his execution; or seek an order that would preclude the State of Texas from executing him by lethal injection using available alternatives." (Instrument No. 13, Exhibit A, at 3) (emphasis in original).

It is clear to the Court that Mr. Harris is willing to concede acceptable alternatives to the contested protocol. Accordingly, he satisfies this third factor set forth by the Supreme Court in *Nelson.*

### D.

The contested method of lethal injection can be shown neither to be statutorily mandated nor to be the sole method by which the State of Texas may accomplish its chosen method of execution. In addition, the Plaintiff is not challenging the State's right to execute him. The Court

finds, therefore, that Plaintiff's attack on the method of lethal injection does not comprise an attack on the death sentence itself. Accordingly, Plaintiff's motion for relief properly falls within § 1983 and not within federal habeas corpus. The claim, therefore, is not barred from consideration by any prior habeas application, and the Court will address the merits of the request for a temporary restraining order. Because the Court concludes that Plaintiff's motion does not sound in habeas, Defendants' Motion to Dismiss (Instrument No. 14) Plaintiff's suit as a successive habeas petition is **DENIED.**

### II.

Section 1983 allows a court to grant equitable relief for constitutional violations. A federal court may grant injunctive relief in a § 1983 case when it finds (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat of irreparable injury to the plaintiff if the injunction is denied; (3) that the potential injury to the plaintiff outweighs the potential harm that granting the injunction might visit on the defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Tex. Catastrophe Property Ins. Ass'n v. Morales,* 975 F.2d 1178, 1180 (5th Cir. 1992). In addition, the Supreme Court stated in *Nelson* that "a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim" when making the determination whether or not to stay an execution pending further adjudication. *Nelson,* 124 S.Ct. at 2126. Because the Defendant placed significant emphasis on the issue of delay, the Court will address that issue before proceeding to the four factors of an injunction analysis.

## A.

The State claims that, even if Harris' complaint is viewed under § 1983, it should be dismissed because of his dilatory conduct in raising his claim. The State claims that Plaintiff had ample opportunity to raise his claim prior to April 15, 2004, when he first brought the claim before this Court. (Instrument No. 14, at 6). Harris counters with the following chronology of events:

| | |
|---|---|
| Apr.1986: | Harris is convicted of capital murder and sentenced to death. |
| Sept. 13, 1989: | The Texas Court of Criminal Appeals denies Harris' direct appeal. |
| Sept. 12, 1990: | Harris files an application for post-conviction habeas relief in state court. |
| Dec. 18, 1991: | Habeas relief is denied. |
| Apr. 28, 1992: | Harris files an application for post-conviction relief in federal court. |
| Sept. 24, 2001: | The district court adopts the magistrate judge's recommendation and grants habeas relief. |
| Nov. 18, 2002: | The Fifth Circuit reverses the judgment of the district court. |
| Mar. 1, 2004: | Harris' application for writ of certiorari to the United States Supreme Court is denied, after being held for almost a year, pending adjudication of *Banks v. Dretke*, —— U.S. ——, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). |
| Apr. 1, 2004: | Harris is assigned the execution date of June 30, 2004. |
| Apr. 15, 2004: | Harris files the case at bar in this Court. |
| Apr. 29, 2004: | This Court dismisses the claim without addressing the merits. |
| May 18, 2004: | Harris files notice of appeal. |
| May 24, 2004: | The United States Supreme Court decides *Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, —— L.Ed.2d —— (2004). |
| June 3, 2004: | Harris files a Rule 60 motion with this Court. |
| June 4, 2004: | The Rule 60 motion is denied because the case is pending on appeal. |

(Instrument No. 13, Exhibit A, at 3–6). This Court cannot discern where in this chronological list of events Mr. Harris might have had "ample" time to make this § 1983 claim. Until the ruling in *Nelson*, the controlling precedent of the Fifth Circuit has been that a § 1983 brought by state prisoners challenging a method of execution was "a de facto habeas challenge" and was the functional equivalent of a habeas action. *See Martinez v. Tex. Court of Criminal Appeals*, 292 F.3d 417, 420 (5th Cir.2002). Because Harris had

already sought federal habeas relief, his § 1983 motion would be considered a successive habeas petition and would be denied, as it was by this Court on April 29, 2004. It was not until the Supreme Court granted certiorari in *Nelson* that any chance arose that the Fifth Circuit precedent might change. Accordingly, Mr. Harris had no likelihood of success on his § 1983 motion until, at the earliest, December 1, 2003, the date the Supreme Court granted certiorari in *Nelson*.

In addition, Harris' denial of federal habeas relief did not become final until March 1, 2004. There was no reason for him to attack the method of his execution before that date because the likelihood that the district court's grant of habeas relief would be upheld was just as strong as the likelihood that the appellate court's reversal of the grant would be upheld. The "ample" time to which the State refers is a mischaracterization, for Mr. Harris has spent the 18 years since his conviction proceeding through state appeals, state habeas proceedings, and federal habeas proceedings, to which he is constitutionally entitled.

The State claims that "Harris has offered no credible explanation as to why he waited until his execution became imminent to present his complaint." (Instrument No. 14, at 9). In addition to the arguments stated above, however, regarding the chronological procession of this case through the courts, Plaintiff also argues that it was not until 2001 that the American Veterinary Medical Association first forbid the use of sedatives in conjunction with neuromuscular blocking agents, as are used in the Texas lethal injection cocktail. (Instrument No. 13, Exhibit B, at 10 n. 4). The medical information in support of Plaintiff's claim was not available for the entirety of the past 18 years, so the claim could not possibly have been

asserted, based on the medical research then available.

The Court believes credible explanations for the perceived delay are sufficient and that the State's argument that "Texas' lethal injection protocol has not changed since it was first used in 1982" is deceptive and, more importantly, irrelevant. (*Id.*, at 9). As stated previously, the State used hanging as the means of execution from 1819 to 1923 and used electrocution from 1923 until 1977. The State switched from hanging to electrocution because, as stated in the 1923 bill implementing the change, "[t]he system [of hanging] is antiquated and has been supplanted in many states by the more modern and humane system of electrocution." 1923 TEX. GEN. LAWS 51 § 14; *see also* Deborah W. Denno, *Getting to Death: Are Executions Constitutional?*, 82 IOWA L.REV. 319, 460 n. 910 (1997). The State later switched from electrocution to lethal injection because lethal injection was considered a "far more humane method of execution than electrocution" and because electrocution was considered to be a " 'gruesome ritual' " and the electric chair was " 'a barbaric torture device.' " Denno, *supra*, at 460 n. 911 (citing Martin R. Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment*, 39 OHIO ST. L.J. 96, 126–27 n. 228 (1978)). It is clear, therefore, that even after 104 years, or even after 54 years, a formerly accepted and supported method of execution may be found to have become "barbaric." This phenomenon is due to what our Supreme Court calls "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

In 1997, Texas became the first state to grant an evidentiary hearing on the constitutionality of lethal injection, "given the substantial amount of evidence suggesting that the state's procedure is cruel and unusual." Denno, *supra*. At that time, the lethal injection procedure in Texas was not found to violate the evolving standards of decency of our society. In the seven years since that hearing, however, much has changed in the State's and the country's views on lethal injection. In 2003, Texas "passed legislation criminalizing inhumane methods of euthanizing animals, including the use of neuromuscular blocking agents such as pancuronium bromide." (Instrument No. 2, at 14) (citing TEX. HEALTH & SAFETY CODE, § 821.056). In 2000, the American Veterinary Medical Association has "explicitly forbidden the combinatory use of a sedative with a neuromuscular blocking agent during euthanasia." (*Id.*) (citing *2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001)). And over the past several years, seventeen other states have either explicitly or implicitly enacted laws recognizing the use of a neuromuscular blocking agent for euthanization of animals as inhumane. (*Id.*). These changes have all occurred recently, and they negate Defendants' argument that the Texas protocol's longevity proves that Plaintiff could have brought this suit long ago. Accordingly, the Court finds that Mr. Harris did not delay unnecessarily in bringing this claim.

**B.**

■ The first factor in a court's consideration of a motion for a temporary restraining order ("TRO") is the plaintiff's likelihood of success on the merits. A TRO may be denied based solely on the plaintiff's failure to demonstrate likelihood of success on the merits of his claims. *See Walgreen Co. v. Hood*, 275 F.3d 475, 477 (5th Cir.2001). To determine whether Plaintiff has shown a likelihood of success on the merits, the Court looks to the law

underlying Mr. Harris' claim for injunctive relief. Pursuant to § 1983, Plaintiff must show "(1) that the [Defendants] deprived him of a right secured to him by the Constitution or federal law and (2) that the deprivation occurred under color of state law." *Brown v. Miller*, 631 F.2d 408, 410 (5th Cir.1980).

Plaintiff asserts that his "constitutional claim is weighty, and there is therefore a substantial likelihood that he will prevail on the merits." (Instrument No. 2, at 16). Plaintiff states that the "Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death." (*Id.*, at 2) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (opinion of Reed, J.)). He argues that " '[p]unishments are cruel when they involve . . . a lingering death' " and are "particularly constitutionally offensive if [they] involve the foreseeable infliction of suffering." (*Id.*) (citing *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Furman v. Georgia*, 408 U.S. 238, 273, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)) (emphasis removed). Plaintiff claims that it is "not only foreseeable but also predictable that death by lethal injection as it is currently carried out in this State will produce unnecessary pain, torture and lingering death." (*Id.*, at 3).

In support of this allegation, Plaintiff presents the factual arguments that the particular protocol used by Texas in inflicting lethal injection violates the Eighth Amendment. He states that sodium thiopental is a short-acting anesthesia, meant to wear off after "mere minutes." (Instrument No. 2, at 3–4). In support of this contention, Plaintiff cites to affidavits of Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee (Instrument No. 2, Exhibit 1), and of Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University (Instrument No. 2, Exhibit 2), which were submitted in *Texas v. Jesus Flores*, No. 877,994A. Plaintiff states that the drug has "only a minimal sedative effect that does not last through the execution process." (Instrument No. 13, Exhibit A, at 7).

Plaintiff also states that the second drug, pancuronium bromide, or Pavulon, the neuromuscular blocking agent, serves "only to mask the excruciating pain of the condemned inmate." (Instrument No. 2, at 5). In support of this contention, Plaintiff cites to the above mentioned affidavits and to the affidavit of a woman who received a neuromuscular blocking agent and an ineffective administration of sedative. (Instrument No. 2, Exhibit 3). Mr. Harris states that the neuromuscular blocking agent "paralyzes all skeletal or voluntary muscles, but has no effect on awareness, cognition or sensation" such that it will "appear as if the condemned is serene and pain-free, but it does absolutely nothing to alleviate the excruciating pain caused by the third drug in the process." (Instrument No. 13, Exhibit A., at 7–8).

Plaintiff states that administration of the third drug, potassium chloride, most likely causes death by suffocation rather than cardiac arrest, as intended. (Instrument No. 2, at 8). In support of this statement, Plaintiff refers to the affidavit of James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt Medical Center, in the case of *Abu–Ali Abdur'Rahman v. Bell*, 226 F.3d 696 (6th Cir.2000). (*Id.*). Harris states that potassium chloride "is an extraordinarily painful chemical that activates the nerve fibers lining the inmate's veins and interferes with the rhythmic contractions of the

heart. But, it is entirely inadequate to achieve reasonable cardiac standstill." (Instrument No. 13, Exhibit A, at 8). In combination, Plaintiff argues, the three drugs act in the following way: "As the inmate loses oxygen [due to the third chemical (potassium chloride)], the first chemical (sodium thiopental) is providing little or no sedative effect, and the second chemical (pancuronium) is preventing the inmate from expressing his agony." (*Id.*).

Plaintiff also argues that "[r]ecent research in, and subsequent legal changes regarding, pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster. Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a neuromuscular blocking agent." (Instrument No. 2, at 13). Plaintiff asserts that a "euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well." (*Id.*).

In response to Plaintiff's claim, the State calls Mr. Harris' arguments "speculative" and "specious." (Defendants' Opposition to Plaintiff's Request for TRO, at 5). Defendants state, "The gist of Harris' argument seems to be that the use of pancuronium bromide ... is inhumane because the inmate might wake up from insufficient administration of the first drug and suffer pain from the third drug, but be unable to express pain because of the paralyzing effect of the second drug." (*Id.*). The State claims, in response to this rendition of the Plaintiff's argument, that the sodium thiopental (the first drug) is administered at a lethal dosage, as opposed to a surgical or therapeutic dosage. In support of this contention, the State refers to *Ex parte Granviel*, 561 S.W.2d 503, 508 & n. 7 (Tex. Crim.App.1978).

The State claims that "Harris has produced absolutely no evidence discrediting *Granviel's* findings as to the effect of a potentially lethal dose of the first drug or otherwise criticizing the specific dosages ... and procedures used in Texas." (Defendants' Opposition to Plaintiff's Request for TRO, at 6). While it may be true that Plaintiff has not provided such evidence, the Court feels compelled to present, itself, two obvious legal arguments discrediting *Granviel's* findings: The case was decided in 1978, four years before the first execution by lethal injection was ever performed in the State of Texas, and the "findings" were based, in part, on an article, apparently from 1953, written by the Royal Commission on Capital Punishment in London, England, which stated only the following:

> The drug, *probably a barbiturate*, such as hexobarbitone or thiopentone, would be injected into a vein, preferably at the bend of the elbow or the wrist. In about twenty or thirty seconds, perhaps before the dose was completed, the drug would reach the brain. The prisoner would then become unconscious and die a minute or two later. There would be no danger of failure if a large enough dose were given, and the prisoner would feel nothing after the prick of the needle.

*Granviel*, 561 S.W.2d at 508 n. 7 (emphasis added). *Granviel* simply is not precedent for the case at bar. The Court finds that the Plaintiff need not produce evidence "discrediting *Granviel's* findings" because those findings are based on outdated and speculative medical information.

The Defendants also rely upon *Woolls v. McCotter*, 798 F.2d 695 (5th Cir.1986), to argue that the "speculations as to potential inadequate or improper administration of sodium thiopental resulting in physical and mental pain ... upon the administration of additional drugs, including the second, paralyzing drug, has explicitly been previously considered and rejected by the Fifth Cir-

cuit." (Defendants' Opposition to Plaintiff's Request for TRO, at 6–7). In rejecting the petitioner's Eighth Amendment claim in *Woolls,* the Fifth Circuit found,

> .First, the appellant has not even alleged, much less produced any evidence, that the Texas Department of Corrections allows anyone other than trained medical personnel to administer lethal injections. Second, the appellant has neither alleged nor produced evidence that would indicate that improper dosages of sodium thiopental have been or will be administered so as to result in physical or mental pain. Finally, even if the physical and mental manifestations noted by Dr. Hodes were experienced by an individual, this showing "of discomfort or unnecessary pain" falls far short of the showing found insufficient in *Gray v. Lucas* [710 F.2d 1048, 1057–61 (5th Cir. 1983) ].

*Woolls,* 798 F.2d at 698. The Court notes, first, that this case was decided in 1986 and that, as stated previously, evolving standards of decency can change in such a period of time. Second, as to the findings of the Fifth Circuit in this case, the court focused solely on the sodium thiopental and makes no mention whatsoever of pancuronium bromide (the second drug), the neuromuscular blocking agent that is most at issue in the case at bar. It is recent scientific analyses of the blocking agent and its interaction with the sedative that fuel the Plaintiff's motion for relief. Because *Woolls* was decided so many years prior to the discovery of this scientific data, and because *Woolls* was decided without any regard for the existence of a paralyzing blocking agent, the Court finds that the case cannot be dispositive of Mr. Harris' claim.

Other than calling Mr. Harris' claims speculative and specious, and other than referring to two grossly irrelevant cases, Defendants offer no argument against the merits of Plaintiff's claim. Plaintiff, on the other hand, has offered a historical and factual argument in support of his claim that the protocol for lethal injection in Texas violates evolving standards of decency that guide the Eighth Amendment analysis. Accordingly, the Court finds Plaintiff has made a showing of a likelihood to succeed on the merits in satisfaction of the first factor in the TRO analysis.

### C.

■ The Court's next considerations are the threat of irreparable injury to the Plaintiff if the TRO is denied and the threat of harm to the Defendants if the TRO is granted. Plaintiff argues that, "if the injunction is not granted, Plaintiff will suffer irreparable injury, because he will be executed before the merits of his cogent claim [are] addressed," but that "the injunction will do no harm to the Defendants because they will be free to execute Mr. Harris at some future date should they prevail on the ultimate merits of this litigation." (Instrument No. 2, at 16). At oral argument, the State asserted that there was no threat of irreparable harm to the Plaintiff because the State's method of execution is quick, humane, and effective. The State also contended that the threat of harm to the State stemmed from delaying the execution.

The Court, then, turns to the relative harms to the parties that will be incurred by the grant or denial of the TRO. With regard to the harm visited on the State by the grant of the TRO, there seems to be little potential for injury. Mr. Harris "emphasizes that the restraining order and the injunction he seeks would *not* preclude Defendants from employing alternative means of lethal injection" and argues that, therefore, a temporary restraining order, "will not unduly interfere with any legitimate interests" of the State. (Instrument No. 13, at 2) (emphasis in original). In-

deed, Defendants have proffered no argument as to why the temporary injunction of Harris' execution would visit an undue burden on the State. It is certain that the State has a "significant interest in enforcing its criminal judgments." *Nelson,* 124 S.Ct. at 2126. It is, however, unclear to the Court how a TRO might threaten that interest, given the fact that the Plaintiff's exercise of his constitutional rights in this case have been proceeding through the courts for eighteen years.

The potential harm to Plaintiff, on the other hand, is clear, potent, and irreversible. "In the absence of a temporary restraining order, Harris will obviously suffer irreparable injury," according to the Plaintiff. (Instrument No. 13, at 3). If Plaintiff's contentions are correct, the denial of a TRO will subject Plaintiff to an excruciating death, which certainly qualifies as irreparable harm. If Plaintiff's contentions are incorrect, however, the grant of a TRO may quickly be remedied and the State's interest in enforcing its death sentence may be expeditiously satisfied.

With regard to the relative burdens of the parties, the Court believes a temporary injunction allowing for responsible adjudication of this claim will not damage the State's significant interest in enforcing its criminal judgments and will insulate Mr. Harris from irreparable harm of the most serious nature.

#### D.

█ The final factor to consider in the TRO analysis is whether the granting of the TRO will disserve the public interest. Plaintiff argues that "the public interest will be served, rather than disserved, by meting out punishment in a manner consistent with the protections and procedures derived from the Constitution." (Instrument No. 2, at 16). The State offers no argument on this point. It is apparent to this Court that confidence in the humane application of the governing laws of the State must be in the public's interest. It is, on the other hand, beyond the Court's comprehension that a temporary restraining order in this case, that would delay but not halt the execution, could disserve the public interest. While the Court understands that it has been 18 years since Mr. Harris' conviction, no significant harm to the public interest could arise from the proper, informed, deliberate adjudication of this claim. Accordingly, the Court finds that the public interest will not be disserved by the granting of this TRO.

#### E.

Finally, the Defendants present the Court with three distinct arguments against the grant of an injunction in this case, based on Supreme Court precedent. The Court addresses each argument in turn.

#### 1.

The State argues, first, that the Supreme Court's denials of applications for stays of execution in the Texas cases *Bruce v. Johnson,* — U.S. ——, 124 S.Ct. 1142, 157 L.Ed.2d 966 (Jan. 14, 2004), *Zimmerman v. Johnson,* — U.S. ——, 124 S.Ct. 1168, 157 L.Ed.2d 1059 (Jan. 21, 2004), and *Vickers v. Johnson,* — U.S. ——, 124 S.Ct. 1196, 157 L.Ed.2d 1224 (Jan. 28, 2004), should guide this Court to denying Harris' application for a TRO. In these pre-*Nelson* cases, the Supreme Court refused to reverse the Texas district courts' and Fifth Circuit's prior denials of applications to stay.

First, those judgments by the Supreme Court are distinct from this one, for this Court is not reviewing and overturning prior judgments against a stay but is, instead, considering whether or not—as a matter of first impression—a TRO should be granted, giving the parties enough time

to thoroughly brief and argue the merits of a claim.

Second, the Supreme Court merely denied these stays of execution, issuing no opinions or analyses of the merits, facts, or arguments in the cases. There is, therefore, little from the Supreme Court's denials to guide this Court. Third, all three of these cases were decided prior to the Supreme Court's hearing of oral arguments or the issuance of its decision in *Nelson*. All three were summarily denied in January 2004, while arguments were not heard in *Nelson* until March and the opinion was not issued until May. The three cited cases, therefore, are of limited use to the analysis of this Court.

### 2.

Second, the State cites three cases from other federal circuits in which the Supreme Court denied or vacated stays of execution sought by inmates challenging various aspects of the execution processes to which they would be exposed.[1] Again, all three of these cases were decided in January 2004 and were, therefore, decided before either the oral argument of *Nelson*, which took place on March 29, 2004, or the issuance of the Court's decision in that case, on May 24, 2004. The Plaintiff argues that "[w]ithout the benefit of *Nelson's* analysis and holding, these actions have no precedential or persuasive impact on the issue currently before this Court." (Instrument No. 13, Exhibit B, at 4–5). In addition, all three of these cases, like the Texas cases cited previously, were ruled on by the Supreme Court, but no opinions were issued.

While the Court believes the rulings are and must be considered, they must be considered in their complete chronological and procedural context. These three cases were decided prior to *Nelson*, which is now the controlling case law on this issue. All three of the cases were also decided by a narrow margin of 5–4 in the Court, while *Nelson* was decided by a unanimous Court. To the extent that this fact has any bearing on Harris' case at all, this Court believes that the difference in the Supreme Court's unanimity or division leans in favor of granting less rather than more deference to the January cases cited by the State. The prior cases are, therefore, of limited use in the Court's analysis.

### 3.

Finally, the State refers to *Sizer v. Oken,* —— U.S. ——, 124 S.Ct. 2868, 159 L.Ed.2d 290 (2004), in which the Supreme Court vacated an injunction issued by the district court and affirmed by the Fourth Circuit. Plaintiff contends that "a key distinction between Oken's case and the case[s] of Harris and Nelson" is that "the Maryland statute at issue in *Oken* mandated the use of certain of the chemicals challenged by Oken," whereas the statutes in Alabama and Texas are silent on the particular complaints of Mr. Nelson and Mr. Harris, respectively. The Maryland statute provides,

> The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed

---

1. *Ward v. Darks,* —— U.S. ——, 124 S.Ct. 1142, 157 L.Ed.2d 965 (Jan. 13, 2004) (vacating a stay of execution from the Tenth Circuit on a challenge to Oklahoma's method of lethal injection); *Williams v. Taft,* —— U.S. ——, 124 S.Ct. 1142, 157 L.Ed.2d 965 (Jan. 13, 2004) (denying an application for stay of execution on a challenge to Ohio's method of lethal injection); and *Beck v. Rowsey,* —— U.S. ——, 124 S.Ct. 980, 157 L.Ed.2d 811 (Jan. 8, 2004) (vacating a stay of execution entered by the Easter District of North Carolina on a challenge to North Carolina's method of lethal injection).

physician pronounces death according to accepted standards of medical practice. MD CODE, CORRECTIONAL SERVICES, § 3–905. The Supreme Court clearly stated in *Nelson* that a statutory requirement would bar § 1983 consideration of a method-of-execution claim covered by the statutory language. *Nelson*, 124 S.Ct. at 2124. The application of this holding to *Oken* is simple, and it sets *Oken* apart from the case at bar.

Accordingly, the three arguments presented by Defendants that Supreme Court precedent precludes the grant of stay in this case do not persuade this Court. The TRO factors have been satisfied, and the Plaintiff has not been found to have delayed unnecessarily in the bringing of this claim. The TRO is, therefore, warranted under the facts and arguments of the case.

### III.

Plaintiff requests five forms of relief from this Court: (1) a temporary restraining order precluding Harris's execution through the chemical cocktail described in his compliant; (2) a hearing on Harris's request for preliminary injunction; (3) the provision of a "meaningful opportunity to address any defenses that Defendants may raise in this Court to his Section 1983 claims;" (4) a determination that Harris' complaint can proceed under *Nelson*; and (5) in the alternative, the establishment of a briefing schedule that will allow enough time for a meaningful consideration of the question left open in *Nelson*, specifically how to characterize method-of-execution claims. (Instrument No. 13, at 6).

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's request for a TRO **(Instrument No. 13)** is **GRANTED;** Plaintiff's request for a preliminary injunction hearing **(Instrument No. 13)** is **provisionally GRANTED;** Plaintiff's request for a meaningful opportunity to address the Defendants' defenses **(Instrument No.**

**13)** is **DENIED as moot;** Plaintiff's request for a determination that Mr. Harris' complaint may proceed under *Nelson* **(Instrument No. 13)** is **GRANTED;** and Plaintiff's request for a briefing schedule to address *Nelson* **(Instrument No. 13)** is **DENIED as moot.** Defendants' Motion to Dismiss **(Instrument No. 14)** is **DENIED.** The Court **GRANTS** an interlocutory appeal of this ruling pursuant to 28 U.S.C. § 1292(b). A preliminary injunction hearing shall be scheduled within 10 days following a ruling by the Court of Appeals.

The Clerk will deliver a copy of this Order to the parties.