JUDGE WINTHROP, concurring in part and dissenting in part.
 

 ¶116 Substantial evidence supports the jury's determinations regarding the defendant's role and criminal intent in carrying out these horrendous murders. I concur with the majority's analysis and resolution of the procedural and substantive issues raised in this appeal. I depart from my colleagues, however, on the issue of imposition of the death penalty. On that basis alone, and for reasons set forth below, I respectfully dissent.
 

 ¶117 The historical implementation of the death penalty bears little resemblance to its current administration. In distant times when the death penalty was quickly imposed, the execution was open for public viewing, and there was minimal evidence to contradict the accuracy of a defendant's conviction, the death penalty may have served as an efficient method of not only enforcing criminal law but also advancing legitimate policy goals. Society, however, has evolved and no longer administers the death penalty in this manner.
 

 ¶118 Instead of taking weeks, prisoners on death row, and the victim's families, often wait for decades for the sentence to be administered. Further, over the years, numerous
 studies have criticized the death penalty as disproportionally affecting defendants of color and, with increasing frequency, in part due to advancements in technology, we have become aware of defendants who have been wrongly convicted and whose death sentences have ultimately been commuted-either due to their own actual innocence or because of incurable procedural flaws from their trial. Some of these wrongful convictions were obtained because of overzealous prosecutors who pursued conviction and imposition of the death penalty at the expense of candor; some convictions were obtained because of the failures of defendants' resource-deprived appointed counsel; some convictions were obtained because of jurors' biases; and some may have been fortuitously imposed simply because of the county in which the defendant committed the crime. Each conviction obtained through these means highlights the flaws in administering the death penalty, and our historic inability to devise a method to implement the death penalty free from human bias and error.
 

 ¶119 Additionally, the death penalty has not been conclusively shown to deter criminal behavior, a primary rationale of criminal law and sentencing. Moreover, taxpayers are spending millions of dollars to prosecute, convict, and sentence defendants to death. As further explained below, the death penalty has been shown to be cruel and unusual, to not have any notable deterrent effect, to impose unintended trauma on the victim's family and friends, and to be cost prohibitive.
 

 ¶120 Although current United States Supreme Court jurisprudence rejecting Eighth Amendment attacks on the death penalty preclude a state court from interpreting the United States Constitution to provide greater protection than the Court's own federal constitutional precedents provide,
 
 Arkansas v. Sullivan
 
 ,
 
 532 U.S. 769
 
 , 772,
 
 121 S.Ct. 1876
 
 ,
 
 149 L.Ed.2d 994
 
 (2001), state courts "are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution."
 
 Arizona v. Evans
 
 ,
 
 514 U.S. 1
 
 , 8,
 
 115 S.Ct. 1185
 
 ,
 
 131 L.Ed.2d 34
 
 (1995). Because we may interpret Arizona's Constitution to provide greater protections to Arizona citizens, I would hold, as a matter of state law, that the death penalty is unconstitutional.
 
 [1]
 

 A. Cruel and Unusual Punishment
 

 ¶121 Throughout history, the Fifth Amendment has provided a constitutional basis for the death penalty. U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). The Fifth Amendment, however, does not grant unbridled discretion in sentencing defendants convicted of capital crimes to death; rather, the Fifth Amendment is limited by the Eighth Amendment's prohibition against cruel and unusual punishment.
 
 See
 
 U.S. Const. amend. VIII ;
 
 see also
 

 Trop v. Dulles
 
 ,
 
 356 U.S. 86
 
 , 100,
 
 78 S.Ct. 590
 
 ,
 
 2 L.Ed.2d 630
 
 (1958) (stating that "[w]hile the State has the power to punish, the [Eighth] Amendment stands to assure that this power be exercised within the limits of civilized standards"). Similarly, Arizona's statutory capital sentencing scheme is limited by article 2, § 15 of the Arizona Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.").
 

 ¶122 Neither the federal nor state constitution defines what constitutes "cruel and unusual" punishment. Instead, we determine what constitutes cruel and unusual punishment based on "the evolving standards of
 decency that mark the progress of a maturing society."
 
 Trop
 
 ,
 
 356 U.S. at 101
 
 ,
 
 78 S.Ct. 590
 
 ;
 
 accord
 

 Furman v. Georgia
 
 ,
 
 408 U.S. 238
 
 , 242,
 
 92 S.Ct. 2726
 
 ,
 
 33 L.Ed.2d 346
 
 (1972) (Douglas, J., concurring);
 
 see also
 

 Weems v. United States
 
 ,
 
 217 U.S. 349
 
 , 378,
 
 30 S.Ct. 544
 
 ,
 
 54 L.Ed. 793
 
 (1910) (explaining that what is "cruel and unusual" "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice") (citing
 
 Ex parte Wilson
 
 ,
 
 114 U.S. 417
 
 , 427,
 
 5 S.Ct. 935
 
 ,
 
 29 L.Ed. 89
 
 (1885) and
 
 Mackin v. United States
 
 ,
 
 117 U.S. 348
 
 , 350,
 
 6 S.Ct. 777
 
 ,
 
 29 L.Ed. 909
 
 (1886) ).
 

 ¶123 The majority opinion argues that determining "evolving standards of decency that mark the progress of a maturing society" is a role reserved for the legislature and, as a matter of respecting constitutionally-mandated separation of powers, courts should decline to usurp that role.
 
 Supra
 
 ¶¶ 108, 111-12. Although the lawmaking role belongs to our legislature, legislative measures are not the sole determinant of the bounds of the Eighth Amendment; indeed, the Eighth Amendment is intended to safeguard against the abuse of legislative power.
 
 See
 

 Gregg v. Georgia
 
 ,
 
 428 U.S. 153
 
 , 174,
 
 96 S.Ct. 2909
 
 ,
 
 49 L.Ed.2d 859
 
 (1976). Because article 2, § 15 imposes a similar restraint on the exercise of the legislative power as it relates to imposition of the death penalty, our courts must bring their own independent judgments to bear on this question.
 
 See
 

 Atkins v. Virginia
 
 ,
 
 536 U.S. 304
 
 , 312,
 
 122 S.Ct. 2242
 
 ,
 
 153 L.Ed.2d 335
 
 (2002).
 

 ¶124 Further, it is expressly the role of the court to consider "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether national consensus repudiates the sentencing practice at issue.
 
 Roper v. Simmons
 
 ,
 
 543 U.S. 551
 
 , 563,
 
 125 S.Ct. 1183
 
 ,
 
 161 L.Ed.2d 1
 
 (2005). And, guided by "the standards elaborated by controlling precedents and
 
 by the [c]ourt's own understanding and interpretation
 
 of the Eighth Amendment's text, history, meaning, and purpose," the court must determine whether the punishment in question violates the Constitution.
 
 Kennedy v. Louisiana
 
 ,
 
 554 U.S. 407
 
 , 421,
 
 128 S.Ct. 2641
 
 ,
 
 171 L.Ed.2d 525
 
 (2008) (emphasis added).
 

 ¶125 Although article 3 of the Arizona Constitution appears to prohibit any comingling of the legislative, executive, and judicial powers, Arizona courts have acknowledged a sharing or blending of those powers, particularly where the issue is prevention and punishment of criminal activity.
 
 State v. Ramsey
 
 ,
 
 171 Ariz. 409
 
 , 413,
 
 831 P.2d 408
 
 , 412 (App. 1992). This Court has acknowledged that blended powers are not
 
 per se
 
 invalid.
 
 State ex rel. Woods v. Block
 
 ,
 
 189 Ariz. 269
 
 , 275-76,
 
 942 P.2d 428
 
 , 434-35 (1997). While still respecting Arizona's firmly-established principle of separation of powers, this Court adopted the test established by the Arizona Court of Appeals that determines whether "one branch of government is exercising the powers belonging to either of the others."
 

 Id.
 

 (adopting the multi-part test established in
 
 J.W. Hancock Enters., Inc. v. Ariz. State Registrar of Contractors
 
 ,
 
 142 Ariz. 400
 
 , 405,
 
 690 P.2d 119
 
 , 124 (App. 1984) ) (internal citation omitted). Where, as here, we review defendant's convictions and the imposition of the sentence of death-the ultimate punishment intended, in theory, to deter criminal activity-the exercise of such blended authority is indeed appropriate.
 
 See
 

 Ramsey
 
 , 171 Ariz. at 413,
 
 831 P.2d at 412
 
 .
 

 ¶126 We no longer question whether the Eighth Amendment prohibits certain punishments like "public dissection, burning alive, ... crucifixion, [and] breaking on the wheel" as cruel and unusual, because our courts have routinely found these punishments, or their equivalents, to be unconstitutional.
 
 Glossip v. Gross
 
 , --- U.S. ----,
 
 135 S.Ct. 2726
 
 , 2792,
 
 192 L.Ed.2d 761
 
 (2015) (Sotomayor, J., dissenting) (internal quotation marks omitted) (quoting
 
 Wilkerson v. Utah
 
 ,
 
 99 U.S. 130
 
 , 135-36,
 
 25 L.Ed. 345
 
 (1879) and
 
 In re Kemmler
 
 ,
 
 136 U.S. 436
 
 , 446,
 
 10 S.Ct. 930
 
 ,
 
 34 L.Ed. 519
 
 (1890) ). Moreover, over the years we have categorically barred certain punishments as cruel and unusual, such as punishments which involve torture or the denaturalization of a citizen, in certain circumstances.
 
 See
 

 Trop
 
 ,
 
 356 U.S. at 101
 
 ,
 
 78 S.Ct. 590
 
 . More recently, the Supreme Court has expanded which punishments the Constitution categorically
 prohibits to include imposing a death sentence on a minor,
 
 Roper
 
 ,
 
 543 U.S. at 568
 
 ,
 
 125 S.Ct. 1183
 
 , or on a defendant that suffers from a mental disability.
 
 Atkins
 
 ,
 
 536 U.S. at 321
 
 ,
 
 122 S.Ct. 2242
 
 .
 

 ¶127 Society's standard of what constitutes cruel and unusual punishment has continued to evolve to the point where many states have either abolished the death penalty in its entirety or, by inaction over a period of years, have signaled concerns about the constitutionality of such a punishment.
 
 [2]
 
 This trend to abolish the death penalty or not carry out a death sentence stands in stark contrast to the intransigence of other jurisdictions' continued implementation of the death penalty. As society continues to evolve to reject the death penalty, so too should we.
 

 1. Unconstitutionally Cruel
 

 ¶128 Simply stated, the death penalty cannot be implemented in a way that is not cruel. Most modern executions are conducted by lethal injection, which is assumed to be a more humane method of death than prior methods.
 
 See
 
 Death Penalty Info. Ctr.,
 
 supra
 
 ¶ 127 n.2. This assumption, however, has not proven to be true. Numerous defendants executed by lethal injection do not die instantly and instead have appeared to be "drowning in air." Michael Kiefer,
 
 Reporter Describes Arizona Execution: 2 Hours, 640 Gasps
 
 , Arizona Republic, Nov. 6, 2014, https://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637. Executions, which are only supposed to last approximately ten minutes, have lasted for hours before the defendant was pronounced dead.
 
 Id.
 
 Other execution attempts have required the state to halt the process and later make another attempt (often, multiple attempts) to execute a defendant.
 
 See, e.g.
 
 ,
 
 State v. Broom
 
 ,
 
 146 Ohio St.3d 60
 
 ,
 
 51 N.E.3d 620
 
 , 623 (2016) (concluding that a state does not violate the Constitution by attempting to execute a defendant after a failed execution),
 
 cert. denied
 
 , --- U.S. ----,
 
 137 S.Ct. 590
 
 ,
 
 196 L.Ed.2d 486
 
 (2016).
 

 ¶129 Not only does the defendant suffer the pain of dying by lethal injection, which Justice Sotomayor has likened to be the "chemical equivalent of being burned alive"
 
 Glossip
 
 ,
 
 135 S.Ct. at 2795
 
 (Sotomayor, J., dissenting), but the defendant also suffers the mental and emotional turmoil of uncertainty associated with the post-conviction process, the delays associated with last-minute appeals and, ultimately, the uncertainty as to the efficacy of the procedure itself. This "humane" method of death is failing. The result is that death row inmates are subject to physical and emotional torture.
 
 [3]
 

 2. Unconstitutionally Unusual
 

 ¶130 The death penalty not only inflicts unnaturally cruel punishment, but the application and implementation of the death penalty is, at best, arbitrary and capricious, and therefore constitutionally "unusual," and violative of article 2, § 15. The Supreme Court has found that punishments that discriminate against a defendant based on "race, religion, wealth, social position, or class" are unconstitutional.
 
 Furman
 
 ,
 
 408 U.S. at 242
 
 ,
 
 92 S.Ct. 2726
 
 (Douglas, J., concurring);
 
 see also
 

 Gregg
 
 ,
 
 428 U.S. at 188
 
 ,
 
 96 S.Ct. 2909
 
 (concluding that punishment which is "inflicted in an arbitrary and capricious manner" is unconstitutional). Although the original intent may have been to administer the death penalty consistently upon the worst criminals, if
 anything, with time we have realized that we cannot devise a way to implement the death penalty free from explicit or implicit bias.
 

 ¶131 In
 
 Furman
 
 , the Supreme Court struck down the death penalty, as then implemented, as unconstitutional.
 
 408 U.S. at 239-40
 
 ,
 
 92 S.Ct. 2726
 
 . The Court found that the states were disproportionately sentencing defendants of color to death.
 

 Id.
 

 at 254-55
 
 ,
 
 92 S.Ct. 2726
 
 (Douglas, J., concurring). Following
 
 Furman
 
 , many states attempted to devise a more precise sentencing scheme with the goal of curtailing the arbitrary implementation of the death penalty. Four years after
 
 Furman
 
 , the Supreme Court upheld Georgia's sentencing schemes in
 
 Gregg
 
 , essentially reaffirming the constitutionality of the death penalty throughout the nation. Unfortunately, the concerns raised in
 
 Furman
 
 persist despite new sentencing schemes.
 

 ¶132 Although instances of overt discrimination have perhaps abated, jurors today are still affected by racial bias.
 
 See
 
 David R. Dow,
 
 Death Penalty, Still Racist and Arbitrary
 
 , N.Y. Times, July 8, 2011, https://www.nytimes.com/2011/07/09/opinion/09dow.html. In the years following
 
 Furman
 
 and
 
 Gregg
 
 , one study gained renown for highlighting racial discrepancies in criminal sentencing. David C. Baldus, Charles Pulaski & George Woodworth,
 
 Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience
 
 ,
 
 74 J. Crim. L. & Criminology 661
 
 (1983) (the "Baldus study"). The Baldus study evaluated over 2000 homicides in Georgia and found that "black defendants were 1.7 times more likely to receive the death penalty than white defendants and that murderers of white victims were 4.3 times more likely to be sentenced to death than those who killed blacks." Dow,
 
 supra
 
 ;
 
 accord
 
 John D. Bessler,
 
 Tinkering Around the Edges: The Supreme Court's Death Penalty Jurisprudence
 
 ,
 
 49 Am. Crim. L. Rev. 1913
 
 , 1929 (2012). The Baldus study has been tested numerous times since it was initially conducted and has been replicated in other jurisdictions, and yet, "all [studies] reflect the same basic racial bias." Dow,
 
 supra
 
 .
 

 ¶133 As recently as 2015, Justice Breyer noted that "[n]umerous studies ... have concluded that individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty."
 
 Glossip
 
 ,
 
 135 S.Ct. at 2760-61
 
 (Breyer, J., dissenting);
 
 see also
 
 Robert Barnes,
 
 Supreme Court Says Race-Based Testimony Discriminated Against Black Death Row Inmate
 
 , Wash. Post, Feb. 22, 2017, https://www.washingtonpost.com/politics/courts_law/supreme-court-says-race-based-testimony-discriminated-against-death-row-black-inmate/2017/02/22/c7a1590a-f915-11e6-9845-576c69081518_story.html (reporting that the United States Supreme Court would reopen the defendant's sentencing after finding it was infected with racial prejudice); Shelly Song,
 
 Race Consciousness in Imposing the Death Penalty
 
 ,
 
 17 Rich. J.L. & Pub. Int. 739
 
 , 743 (2014) (finding that African Americans make up roughly 42% of the population on death row, and yet, make up only 12.6% of the United States' population). The potential for racial bias in imposition of the death penalty is prevalent throughout the country, and Arizona is no exception.
 
 See
 
 Fair Punishment Project,
 
 Too Broken to Fix: Part I, an In-depth Look at America's Outlier Death Penalty Counties
 
 , Fair Punishment Project 1, 11-12, Aug. 2016, http://fairpunishment.org/wp-content/uploads/2016/08/FPP-TooBroken.pdf (finding that, although African Americans make up only 6% of the population in Maricopa County, they account for about 18% of death penalty defendants).
 

 ¶134 Studies also suggest that, in addition to the arbitrariness of a defendant's perceived race, a defendant's geographic location may also be indicative of whether the death penalty will be imposed.
 
 See
 

 Glossip
 
 ,
 
 135 S.Ct. at 2761
 
 (Breyer, J., dissenting) (stating that "the imposition of the death penalty heavily depends on the county in which a defendant is tried"). One study examining the imposition of the death penalty from 2004 to 2009 found that "just 29 counties (fewer than 1% of counties in the country) accounted for approximately half of all death sentences imposed nationwide."
 

 Id.
 

 (citing Robert J. Smith,
 
 The Geography of the Death Penalty and Its Ramifications
 
 ,
 
 92 B.U. L. Rev. 227
 
 , 231-32 (2012) ). This is largely because "[m]ost death penalty cases are prosecuted
 at the county level, and there are great disparities between the counties."
 
 See
 
 Adam M. Gershowitz,
 
 Pay Now, Execute Later: Why Counties Should Be Required to Post a Bond to Seek the Death Penalty
 
 ,
 
 41 U. Rich. L. Rev. 861
 
 , 862 (2007).
 
 [4]
 

 ¶135 Evidence of arbitrary application of the death penalty by county exists in Arizona as well. While on a national level, relatively few counties sentence defendants to death, Maricopa County is among one of the most active counties to do so. A study published in August 2016, found that only sixteen (including Maricopa County) out of 3143 counties or county equivalents sentenced five or more individuals to death between 2010 and 2015.
 
 See
 
 Fair Punishment Project,
 
 supra
 
 ¶ 133, at 2. Maricopa County's rate of sentencing a defendant to death for a homicide "is approximately 2.3 times higher than the rate for the rest of Arizona."
 
 Id.
 
 , at 8 (citing Frank Baumgartner,
 
 Rate of Death Sentencing 2006-2015
 
 , Aug. 15, 2016, http://fairpunishment.org/wp-content/uploads/2016/08/RateofDeathSentencing2006-2015.pdf).
 
 [5]
 
 Although this case arises from Pima County, and we have rejected the defendant's claims that the prosecutor in this matter engaged in any improper conduct, the vast sentencing differences among the counties demonstrates how arbitrary the implementation of the death penalty is. To be sentenced to death may not entirely depend on the egregiousness of the crime, but rather may be impermissibly influenced by the county where a defendant is tried and/or the prosecutorial charging practice in that county for capital-eligible offenses.
 

 ¶136 Time has shown that the death penalty is imposed in an arbitrary fashion and, other than abolition, states have not found a remedy to cure these deficiencies. We simply can no longer ignore the seemingly inherent variants and problems associated with implementing the death penalty.
 
 See, e.g.
 
 ,
 
 Callins v. Collins
 
 ,
 
 510 U.S. 1141
 
 , 1145,
 
 114 S.Ct. 1127
 
 ,
 
 127 L.Ed.2d 435
 
 (1994) (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death."). To continue to affirm the enforcement the death penalty, given what we now know, is to approve a punishment that is both cruel and unusual.
 

 B. Deterrent Effect
 

 ¶137 One of the main historic rationales offered in support of the death penalty is that it deters future crime.
 
 See
 

 Gregg
 
 ,
 
 428 U.S. at 183
 
 ,
 
 96 S.Ct. 2909
 
 ("The death penalty
 is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders."). Deterrence purportedly works by "discourag[ing] or restrain[ing] [an] individual from acting or proceeding through the inducement of fear, doubt, or some sense of deprivation." Frank G. Carrington,
 
 Deterrence, Death, and the Victims of Crime: A Common Sense Approach
 
 ,
 
 35 Vand. L. Rev. 587
 
 , 588 (1982). The theory of deterrence assumes that humans are motivated to increase gains and minimize losses and will act accordingly.
 

 Id.
 

 Thus, a rational actor will not commit a crime if the consequence (or the cost) of committing that crime becomes too high.
 

 Id.
 

 In the criminal context, deterrence does not necessarily discourage a defendant from committing similar, future crimes, but "sends a message" and discourages the general public from committing crimes based on the punishment a defendant receives.
 

 Id.
 

 ¶138 A flaw of the deterrence theory, however, is that it assumes all individuals, including criminals, act rationally and will undertake a cost/benefit analysis before acting.
 
 See
 
 Rudolph J. Gerber,
 
 Economic and Historical Implications for Capital Punishment Deterrence
 
 ,
 
 18 Notre Dame J.L. Ethics & Pub. Pol'y 437
 
 , 440 (2004). This assumption has proven unreliable. Murders are often committed in situations where the defendant lacked the capacity to act rationally, such as murders committed when the defendant is under the influence of alcohol, is in a sudden fit or rage, or is mentally incompetent (e.g., murder/suicides).
 
 See
 
 Jeffrey Fagan,
 
 Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment
 
 ,
 
 4 Ohio St. J. Crim. L. 255
 
 , 276-77 (2006). Regardless of the irrationality of the underlying criminal act, the death penalty has been justified precisely for its assumed ability to deter future similar behavior.
 
 See
 
 Joanna M. Shepherd,
 
 Deterrence Versus Brutalization: Capital Punishment's Differing Impacts Among States
 
 ,
 
 104 Mich. L. Rev. 203
 
 , 204-05 (2005) (compiling instances of government and public support for capital punishment because of its deterrent effect).
 

 ¶139 In
 
 Gregg
 
 , the Court found that the death penalty's deterrent effect was inconclusive and essentially tasked the state legislatures to determine whether the death penalty had a deterrent effect.
 
 See
 

 Gregg
 
 ,
 
 428 U.S. at 184-86
 
 ,
 
 96 S.Ct. 2909
 
 ("The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions.").
 
 Gregg
 
 was decided in 1976; however, in the subsequent years, there has been no consensus reached regarding this issue.
 

 ¶140 One of the most frequently cited, and criticized, studies on the deterrent effect of the death penalty is Isaac Ehrlich's study from the 1970s,
 
 The Deterrent Effect of Capital Punishment: A Question of Life and Death
 
 , 65 Am. Econ. R. 3 (1975);
 
 see also
 
 Allan D. Johnson,
 
 The Illusory Death Penalty: Why America's Death Penalty Process Fails to Support the Economic Theories of Criminal Sanctions and Deterrence
 
 ,
 
 52 Hastings L.J. 1101
 
 , 1117 (2001). Ehrlich's study found that there was a positive correlation between the death penalty and a decrease in homicides.
 
 See
 
 Ehrlich, at 397; Johnson, at 1118. Ehrlich's study, however, has never been replicated. Johnson, at 1117-18. Indeed, "[m]ost modern empirical studies using Ehrlich's ... analysis have found that the death penalty has virtually the same effect on murder rates as long-term imprisonment."
 

 Id.
 

 at 1118
 
 .
 

 ¶141 Subsequent studies of this issue, however, largely agree that the death penalty has no measurable deterrent effect.
 
 See
 
 Thomas E. Robins,
 
 Retribution, the Evolving Standard of Decency, and Methods of Execution: The Inevitable Collision in Eighth Amendment Jurisprudence
 
 ,
 
 119 Penn. St. L. Rev. 885
 
 , 897 (2015) (finding "[a] recent study conducted by the National Academy of Sciences found no evidence that capital punishment affected homicide rates");
 
 see also
 
 Michael L. Radelet & Traci L. Lacock,
 
 Do Executions Lower Homicide Rates?: The Views of Leading Criminologists
 
 ,
 
 99 J. Crim. L. & Criminology 489
 
 , 489-90 (2009) ("The findings demonstrate an overwhelming consensus among these criminologists that the empirical research conducted on the deterrence question strongly supports the conclusion
 that the death penalty does not add deterrent effects to those already achieved by long imprisonment."). Even if we assumed that the death penalty could deter future crimes, its deterrent effect flows at least in part from its historic implementation, which allowed for the public's observation of the execution.
 
 See
 
 Gerber,
 
 supra
 
 ¶ 138, at 449 ("Our nation's history of capital punishment demonstrates a steady departure from the four requirements [ (1) swiftness; (2) certainty; (3) proportionality; and (4) publicity] needed both for deterrence and for rational calculation of disincentives.").
 

 ¶142 If capital punishment fails to serve a deterrent effect, which we now know is likely true, there is little benefit to be gained from sentencing a defendant to death. Surely any penological goal of retribution is lost by the time the defendant is finally executed (sometimes decades after the commission of the crime).
 

 ¶143 I by no means intend to diminish the pain experienced by the families and friends of the deceased victims by suggesting that the death penalty no longer fulfills the goals of, and its historical role in, criminal punishment. Instead, I question the continued use of the death penalty if it no longer serves society's legitimate goals of deterring crime and bringing just results to crime victims.
 

 C. Financial Costs
 

 ¶144 Supporters of the death penalty view it as serving many functions, both as a punishment for the defendant as well as a benefit to society. It must be noted, however, that the cost of the death penalty, especially considering its apparent minimal, if not nonexistent, deterrent value, far outweighs any lasting benefit society might derive from its continued implementation.
 

 ¶145 Some continue to hold the mistaken belief that the death penalty is a cost-effective way to enforce criminal sentences.
 
 See
 
 Kelly Phillips Erb,
 
 Considering the Death Penalty: Your Tax Dollars at Work
 
 , Forbes (May 1, 2014, 12:12 AM), https://www.forbes.com/sites/kellyphillipserb/2014/05/01/considering-the-death-penalty-your-tax-dollars-at-work/#27e972b6664b. The actual costs of administering capital punishment, however, are staggering. One estimate found that states spend as much as two times the amount per year to simply house death-penalty inmates.
 
 Id.
 
 Another report found that California alone spends approximately $137 million a year on death-row inmates compared to $11.5 million on inmates serving life sentences.
 
 See
 
 Amnesty Int'l,
 
 Death Penalty Cost
 
 , Amnesty Int'l, https://www.amnestyusa.org/issues/death-penalty/death-penalty-facts/death-penalty-cost/ (last visited July 26, 2018) (citing California Commission for the Fair Administration of Justice, July 2008).
 
 [6]
 

 ¶146 Most of these costs are litigation-related.
 
 See
 
 Nicholas Petersen & Mona Lynch,
 
 Prosecutorial Discretion, Hidden Costs, and the Death Penalty: The Case of Los Angeles County
 
 ,
 
 102 J. Crim. L. & Criminology 1233
 
 , 1240-41 (2012). Death-penalty cases are extremely expensive to litigate, in part, because death-penalty cases require at least two death-qualified litigators-one who focuses on the guilt phase, and one who focuses on gathering evidence to present in mitigation.
 
 [7]
 

 See
 
 Am. Bar Ass'n,
 
 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases
 
 ,
 
 31 Hofstra L. Rev. 913
 
 , 999 (2003). Moreover, counties that do not have death-qualified litigators must contract at great expense with outside counsel to represent defendants.
 
 See, e.g.
 
 , David Louis,
 
 The Cost of Death: Legal Fees in Mohave County Death Penalty Cases Cost More than
 

 $1 Million for Each Trial
 
 , DailyMiner, Feb. 25, 2018, https://kdminer.com/news/2018/feb/25/cost-death-legal-fees-mohave-county-death-penalty-/.
 

 ¶147 Many death-penalty cases in Arizona cost the state millions of dollars just for the first trial.
 
 [8]
 

 See
 
 Kent Cattani & Paul J. McMurdie,
 
 Jody Arias and the Cost of Seeking the Death Penalty
 
 , The Nat'l Judicial Coll., Aug. 20, 2015, http://www.judges.org/jody-arias-and-the-cost-of-seeking-the-death-penalty/ (reporting that the Arias trial cost the State around $3 million). The cost for the initial trial does not include the post-conviction process, including appeals and
 
 habeas
 
 proceedings, which further increase the costs to the taxpayers.
 

 Id.
 

 (finding "[t]he death penalty process in Arizona includes ... proceedings that generally span a period of more than 20 years, and such proceedings ... add[ ] hundreds of thousands of dollars in costs for the prosecution and defense, not to mention judicial costs");
 
 see also
 
 Michael Kiefer,
 
 Is the Death Penalty in Arizona on Life Support?
 
 , Arizona Republic, Apr. 23, 2016, https://www.azcentral.com/story/news/local/arizona-investigations/2016/04/23/death-penalty-lethal-injection-arizona-midazolam/83242098/ ("A capital case that goes to trial and results in a not-guilty verdict costs the county an average of $580,255 for defense. A capital trial that ends in a death sentence costs an average of $1,066,187 to defend.").
 
 [9]
 

 ¶148 One solution often offered when the issue of cost is raised is to shorten the appeals process or reduce the number of attorneys representing a defendant. That solution, however, creates even further constitutional problems because it would severely inhibit a defendant's right to due process and fundamentally fair procedures. Any change in how death-penalty cases are staffed, tried, or handled in the post-conviction phase to make the process more affordable will likely create a system that affords defendants even less procedural protections and leaves them open to a greater chance that a wrongful conviction will be obtained. Moreover, given the continued reports that demonstrate defendants may be sentenced to death because of jurors' inherent bias, and studies that demonstrate the death penalty has no identifiable deterrent effect, the answer to the question of whether the cost of the death penalty outweighs the societal benefit is a resounding, "No."
 

 CONCLUSION
 

 ¶149 For these reasons, I respectfully dissent as it relates to the imposition of the death penalty. This Court should conclude that the death penalty violates article 2, § 15 of the Arizona Constitution.
 

 In addition to the grounds discussed herein, I also note that Arizona's death penalty, as currently administered, may be flawed for additional reasons. For a state's capital sentencing scheme to be constitutional, it must serve a narrowing function and "limit the class of murderers to which the death penalty may be applied."
 
 Brown v. Sanders
 
 ,
 
 546 U.S. 212
 
 , 216,
 
 126 S.Ct. 884
 
 ,
 
 163 L.Ed.2d 723
 
 (2006). Instead of ensuring that only those who commit the most heinous crimes are eligible for the death penalty, however, Arizona's list of aggravating factors, A.R.S. § 13-751(F), expands the class of death-eligible defendants to nearly all first-degree murder defendants.
 
 See
 

 Hidalgo v. Arizona
 
 , --- U.S. ----,
 
 138 S.Ct. 1054
 
 , 1057,
 
 200 L.Ed.2d 496
 
 (2018) (Breyer, J., respecting the denial of certiorari) (stating that the unrebutted evidence that approximately "98% of first-degree murder defendants in Arizona were eligible for the death penalty ... points to a possible constitutional problem").
 

 Nineteen states have abolished the death penalty and eleven states have not had an execution in more than eight years.
 
 See
 

 Glossip
 
 ,
 
 135 S.Ct. at 2773
 
 (Breyer, J., dissenting) (citing Death Penalty Info. Ctr.,
 
 States With & Without the Death Penalty
 
 (Nov. 9, 2016), http://www.deathpenaltyinfo.org/states-and-without-death-penalty).
 

 Often lost in the media reporting of the delays and of the botched execution attempts is the continued, inhumane trauma imposed on the victim's families and friends.
 
 See
 
 Jason Marsh,
 
 Does death penalty bring closure?
 
 , CNN, May 20, 2015, https://www.cnn.com/2015/05/20/opinions/marsh-tsarnaev-forgiveness/index.html (finding the victim's families and friends rarely feel closure once a defendant is sentenced to death, in part, because the post-conviction process may take years during which time the facts of the case continue to be replayed);
 
 see also
 
 Samuel R. Gross & Daniel J. Matheson,
 
 What They Say at the End: Capital Victims' Families and the Press
 
 ,
 
 88 Cornell L. Rev. 486
 
 , 490 (2003) (explaining that most of the victim's families and friends just want the process "to be over," which may not occur until decades after the sentence-after the defendant has exhausted his appeals process).
 

 Along with other select jurisdictions, Arizona is notorious for having some of the most aggressive death penalty prosecutors in the country who, at times, have violated ethical rules to obtain a conviction.
 
 See
 
 Fair Punishment Project,
 
 America's Top Five Deadliest Prosecutors: How Overzealous Personalities Drive the Death Penalty
 
 , Fair Punishment Project 1, 20, 24, June 2016, http://fairpunishment.org/wp-content/uploads/2016/06/FPP-Top5Report_FINAL.pdf (naming Kenneth Peasley, from Pima County, known as a "death-penalty machine," as a "runner up" and Jeannette Gallagher, from Maricopa County, a "prosecutor to watch");
 
 see also
 

 State v. Hulsey
 
 ,
 
 243 Ariz. 367
 
 , 388-39 ¶ 89,
 
 408 P.3d 408
 
 , 429-30 (2018) (concluding that another Maricopa County death-penalty prosecutor, Juan Martinez, "engaged in several instances of misconduct" during the case);
 
 In re Peasley
 
 ,
 
 208 Ariz. 27
 
 , 29 ¶¶ 1, 66,
 
 90 P.3d 764
 
 , 766 (2004) (concluding disbarment for "present[ing] false testimony in the prosecution of two capital murder defendants" was required); Michael Kiefer, Rebecca McKinsey & Aubree Abril,
 
 Direct Appeals of Death-Penalty Cases Since 2002
 
 , Arizona Republic, http://archive.azcentral.com/news/projects/prosecutorial-conduct (compiling a list of death penalty cases that underwent direct review by the Arizona Supreme Court from 2002-2009, and reporting that Peasley, Gallagher, and Martinez were found to have engaged in improper conduct during some of their cases) (last visited July 25, 2018).
 

 One possible explanation for a higher incidence of death sentencing in Maricopa County might be that it by far has the largest population of any Arizona county; however, Maricopa County's population is one percent of the nation's population, yet the data shows that it accounts for 3.6 percent of the death sentences returned nationally between 2010 and 2015.
 
 See
 
 Fair Punishment Project,
 
 supra
 
 ¶ 133, at 8. The same Harvard-based report also argues that the charging of a capital offense-and, ultimately imposition of the death penalty-may be as heavily influenced by the attitudes of the County Attorney for the particular state county.
 
 Id
 
 . at 8-9 (noting the capital case charging history of Andrew Thomas as Maricopa County Attorney in pursuing capital charges at "nearly twice the rate of his predecessor");
 
 see also
 
 Jennifer Steinhauer,
 
 Policy Shift on Death Penalty Overwhelms Arizona Court
 
 , N.Y. Times, Mar. 5, 2007, http://www.nytimes.com/2007/03/05/us/05death.html.
 

 Although the exact amount of money a state spends on death-penalty cases varies, the cost of trying death-penalty cases is overwhelmingly more than non-death-penalty cases.
 
 See
 
 Amnesty Int'l,
 
 supra
 
 ¶ 145 (reporting that Kansas spends seventy percent more, Tennessee spends around forty-eight percent more, and Maryland spends approximately three times as much money on death-penalty cases than non-death-penalty cases) (citations omitted).
 

 The requirements to become a death-qualified litigator understandably limit the number of attorneys available to defend capital cases. The result is that qualified counsel, from both the private and public bar, are overworked and may not always be in the best position to provide defendants with comprehensive representation.
 

 These costs may include both the prosecution's and the defense's "cost of preparing for capital trials-including mitigation investigation, retaining experts for both guilt-innocence and punishment phase issues, [and] extensive motions practice." Carol S. Steiker & Jordan M. Steiker,
 
 Cost and Capital Punishment: A New Consideration Transforms an Old Debate
 
 ,
 
 2010 U. Chi. Legal F. 117
 
 , 141 (2010).
 

 One somewhat dated Arizona study, conducted in 2001, found that "it cost an average of $163,897.26 for death sentence cases and $70,231.34 for non-capital cases (resulting in life sentences)." Robert L. Gottsfield & Marianne Alcorn,
 
 The Capital Case Crisis in Maricopa County, What
 
 (
 
 Little
 
 )
 
 We Can Do About It
 
 , 45 Ariz. Att'y 22, 26 (May 2009). The authors of this study, however, examined only thirty cases, and found that "when all true costs are discovered and assessed, the figure will be considerably higher."
 

 Id.